## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**JEFFREY KITCHENS,**

      **Plaintiff / Counterclaim Defendant,**

**v.**

**PEOPLESCOUT, INC.,**

      **Defendant / Counterclaim Plaintiff.**

**CIVIL ACTION FILE**

**NO. 1:23-CV-978-MHC**

## <u>ORDER</u>

This cause of action comes before the Court on Defendant/Counterclaim Plaintiff PeopleScout, Inc. ("PeopleScout")'s Motion for Summary Judgment ("Def.'s Mot.") [Doc. 68], and Plaintiff/Counterclaim Defendant Jeffrey Kitchens ("Kitchens")'s Motion for Partial Summary Judgment [Doc. 77] and Motion to Dismiss Counterclaims and to Strike Affirmative Defense 31 ("Pl.'s Mot. to Dismiss") [Doc 93].  Also before the Court is Kitchens's Objection to the Declaration of Yelena Malinouskaya and Defendant's Summary Judgment Exhibits 4, 5, and 7 ("Pl.'s Objs.") [Doc. 83].

## I.    PROCEDURAL HISTORY

Kitchens initiated the instant lawsuit on February 3, 2023, in the State Court of Gwinnett County, asserting several causes of action arising out of PeopleScout's alleged nonpayment of commissions owed him under an oral agreement.  Compl. [Doc. 1-1].  On March 7, 2023, PeopleScout removed the case to this Court based on diversity jurisdiction.  Notice of Removal [Doc. 1].  Kitchens then filed a First Amended Complaint ("Am. Compl.") [Doc. 35] on August 11, 2023, in which he asserts the following causes of action: (1) breach of oral contract; (2) promissory estoppel; (3) unjust enrichment; (4) breach of confidential relationship and/or fiduciary duty; (5) theft and criminal theft of services pursuant to O.C.G.A. § 51-10-6; (6) attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11; and (7) punitive damages pursuant to O.C.G.A. § 51-12-5.1.  Am. Compl. ¶¶ 36-64.

On May 24, 2024, this Court granted in part and denied in part PeopleScout's Motion for Leave to File Amended and Supplemental Answer and Counterclaims.  May 24, 2024, Order [Doc. 76].  The Court found as follows: (1) PeopleScout demonstrated good cause under Rule 16(b) of the Federal Rules of Civil Procedure to warrant amending the scheduling order to permit the amended pleading; (2) PeopleScout's counterclaims for trade secret misappropriation under the Georgia Trade Secrets Act, ("GTSA"), O.C.G.A. § 10-1-760 et seq., and the

Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., were futile insofar as PeopleScout sought to proceed under the "use and disclosure" theory of liability; and (3) PeopleScout's counterclaims for trade secret misappropriation were not futile insofar as PeopleScout sought to proceed under the "acquisition by improper means" theory of liability.  See generally id.

On June 7, 2024, PeopleScout filed its Amended and Supplemental Answer and Affirmative Defenses to Plaintiff's First Amended Petition and Counterclaims [Doc. 81].  PeopleScout asserts a total of thirty-one affirmative defenses. Affirmative Defenses [Doc. 81 at 14-19].  PeopleScout also asserts counterclaims for Kitchens's alleged violation of the GTSA and the DTSA ("Countercl.") [Doc. 81 at 19-34].

On May 30, 2024, PeopleScout moved for summary judgment on all of Kitchens's claims against it, and on May 29, 2024, Kitchens moved for partial summary judgment in his favor on his breach of contract claim and his claims for prejudgment interest, attorney's fees, and costs.  See generally Def.'s Mem. in Supp. of its Rule 56 Mot. for Summ. J. ("Def.'s Br.") [Doc. 68-2]; Pl.'s Br. in Supp. of His Mot. for Partial Summ. J. ("Pl.'s MPSJ Br.") [Doc. 77-1]. Subsequently, on June 28, 2024, Kitchens filed a Motion to Dismiss PeopleScout's counterclaims against him.  See generally Pl.'s Mot. to Dismiss.

## II.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.    Relevant Factual Background[1]

#### 1.    Kitchens's Employment with PeopleScout

PeopleScout, a subsidiary of TrueBlue, Inc. ("TrueBlue"), operates in the recruiting process outsourcing ("RPO") industry, "providing recruiting and talent acquisition services" to "large organizations to support their fluctuating workforce needs."  Def.'s Resp. to Pl.'s SUMF ¶¶ 1-2; Pl.'s Resp. to Def.'s SUMF ¶¶ 1-2. On January 12, 2021, Kitchens received an offer of employment with a salary of $160,000 per year as the Director of Business Development and Sales.  Pl.'s Resp. to Def.'s SUMF ¶ 3; Letter from Surabhi Mishra, Senior Recruiting Coordinator, to

---

[1] At the outset, the Court notes that, as this case is before it, in part, on the parties' cross-motions for summary judgment, the Court views the evidence presented by the parties in the light most favorable to the non-movant and has drawn all justifiable inferences in favor of the non-movant with respect to each motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Rsch., Inc., 711 F.3d 1264, 1270 (11th Cir. 2013).  The Court has excluded assertions of facts that are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page or paragraph number).  L.R. 56.1B(1), NDGa.  The Court also accepts as admitted those facts contained in Kitchens's Statement of Undisputed Material Facts ("Pl.'s SUMF") [Doc. 72-2], Kitchens's Statement of Additional Facts ("Pl.'s SAF") [Doc. 82-1], and PeopleScout's Statement of Undisputed Material Facts ("Def's SUMF") [Doc. 68-1], which have not been controverted with specific citations to the relevant portions of the record.  See LR 56.1B(2), NDGa.; see also Def.'s Statement of Disputed Material Facts & Evidentiary Objs. ("Def.'s Resp. to Pl.'s SUMF") [Doc. 88-1]; Pl.'s Objs. & Resps. To Def.'s SUMF ("Pl.'s Resp. to Def.'s SUMF") [Doc. 85-1]; Def.'s Resp. to Pl.'s SAF [Doc. 91-1].

Kitchens (Jan. 12, 2021) ("Offer Letter") [Doc. 68-5] at 1.  The Offer Letter

provided that Kitchens would "be eligible to participate in the individual sales

contributor commission plan," and that Kitchens's "eligibility for the commission

will be defined within 45 days of [his] hire date."  Offer Letter at 1.  Additionally,

the Offer Letter provided:

> Upon your acceptance of this employment offer, you will be offered
> and required to sign an at-will employment agreement (the
> "Employment Agreement"), Employee Handbook Acknowledgement,
> Confidentiality, and Security and Software Agreements.  Nothing in
> this offer letter is intended to be a contract of employment or a promise
> of specific treatment in specific situations unless expressly set forth
> herein, nor does this offer letter change your employment-at-will status
> if you accept it.  Subject to the terms of your Employment Agreement
> with the Company should you accept this offer, the Company reserves
> the right to modify your compensation, duties, reporting relationship,
> title, or continued employment as circumstances dictate.
>
> **This offer is contingent upon your agreement to the terms of our
> Confidentiality Agreement, [and] terms of our Employee
> Handbook . . . .**

Id. at 2.

Kitchens electronically signed the Offer Letter on January 12, 2021.  Id.;

Pl.'s Resp. to Def.'s SUMF ¶ 9.  Although PeopleScout produced a signed copy of

the Employment Agreement [Doc. 68-7] and evidence that Kitchens acknowledged

the Employee Handbook [Doc. 68-10], see Screenshots of New Hire Checklist for

Kitchens ("Oracle Screenshots") [Doc. 68-9], Kitchens disputes that he ever signed

or acknowledged either document.  <u>See</u> Pl.'s Resp. to Def.'s SUMF ¶¶ 10, 14.[2]

The Employment Agreement provides that the employee "has no authority to

obligate [PeopleScout] to anything or to bind [PeopleScout] to any agreement

without prior written permission."  Employment Agreement § II(D).  The

Employment Agreement further provides that "[t]he bonus plan[3] and all aspects of

bonus compensation may be changed at the sole discretion of the Company."  <u>Id.</u>

§ I(B).  Finally, the Employment Agreement provides that "no other promises or

other communications made by either Company or Employee are intended to be, or

are, binding unless they are set forth in this Agreement; and [] this Agreement

---

[2] When asked during his deposition whether he remembered acknowledging the
employee handbook, Kitchens testified, "I think so. . . .  I'm sure that
[PeopleScout] gave me a link to an employee handbook and made me sign
something saying I received it."  Dep. Tr. of Jeffrey Kitchens (Dec. 11, 2023)
("Kitchens Dep.") [Doc. 69-1] at 211-12.  Kitchens further testified, "I
acknowledged I received a handbook.  I'm not a hundred percent sure this is the
handbook I received."  <u>Id.</u> at 215.  As to the Employment Agreement, Kitchens
maintained during his deposition that he was "not a hundred percent sure" that he
signed the "exact agreement" presented to him during the deposition.  <u>Id.</u> at 195,
199 (testifying, "I don't remember if I signed this or not").  However, Kitchens
testified that he "would not sign a non-compete," and that Brannon Lacey
("Lacey"), President of PeopleScout, had orally agreed during employment
negotiations that Kitchens would not be held to a non-compete agreement.  <u>Id.</u> at
200.

[3] Kim Trieu ("Trieu"), who was the Senior Director of Business Unit Finance of
TrueBlue during Kitchens's employment, testified that an employee can either be
on a bonus plan or a commission plan, but an employee cannot be on both.  Dep.
Tr. of Kim Trieu (Dec. 14, 2023) [Doc. 69-3] at 53, 112.

contains the entire agreement between the parties and replaces and supersedes any

prior agreements, including previous employment agreements." Id. § V(B).

The Employee Handbook states as follows:

> Terms and conditions of employment with the Company may be
> modified at the sole discretion of the Company, with or without cause,
> with the exception of the terms set forth in any currently valid written
> agreement between an employee and the Company. Other than the
> Chief Executive Officer of the Company or his/her designated agents,
> no one has the authority to make any agreement for employment other
> than for employment at will or to make any agreement limiting the
> Company's discretion to modify the terms and conditions of
> employment. Only the Chief Executive Officer has the authority to
> make any such agreement and then only in writing. No implied contract
> concerning any employment-related decision or term or condition of
> employment can be established by any statement, conduct, policy, or
> practice.[4]

Employee Handbook at 9. The Employee Handbook also contains the following

disclaimer:

> This handbook is a summary of current policies of PeopleScout, Inc.
> (the "Company" or "PeopleScout"). Nothing in this handbook alters
> the fact that all employees of the Company are employed "at will."
> Employment may be terminated, with or without cause or notice, at the
> will of either the employee or the Company. Neither this handbook nor
> any of its contents is an employment contract or an offer to enter into

---

[4] The Employee Handbook defines the "Company" as PeopleScout, not TrueBlue.
However, there is no indication in the record of who the CEO of PeopleScout was
during Kitchens's employment. Instead, it is undisputed that Lacey, as the
President of PeopleScout, was the "highest-ranking officer within PeopleScout,"
and that Lacey reported to the CEO of TrueBlue, who was Patrick Beharelle. Pl.'s
Resp. to Def.'s SUMF ¶ 44; Def.'s Resp. to Pl.'s SUMF ¶ 7.

an employment contract, and neither provides employees with any contract rights.

Id. at 2.

Kitchens began his employment on January 25, 2021. Def.'s Resp. to Pl.'s SUMF ¶ 3. At the time Kitchens was hired, Lacey was the President of PeopleScout. Id. ¶ 8. George Tate ("Tate") was hired as the Senior Vice President of Business Development sometime between January 25 and February 5, 2021. Id. ¶¶ 14-15. Kitchens reported directly to Tate until Tate's employment ended in November 2021. Id. ¶ 16; Pl.'s Resp. to Def.'s SUMF ¶ 61. Additional relevant officers of PeopleScout include Denise Gibson-Smith ("Gibson-Smith"), the Director of Operations, who reported to Candace Lamon ("Lamon"), the Vice President of Client Delivery; and Christopher Gould ("Gould"), the Senior Vice President of Client Delivery. Pl.'s Resp. to Def.'s SUMF ¶¶ 41, 60; Def.'s Resp. to Pl.'s SUMF ¶¶ 20, 22.

According to Kitchens, "[d]uring my recruitment/hiring process, Lacey told me that I would receive a 10% commission on 'direct hire' deals that I closed, and a 3.333% commission on everything else I closed." Third Decl. of Jeffrey Kitchens (May 20, 2024) [Doc. 77-4] ¶ 5.

### 2.    The Incentive Plans

On February 5, 2021, Lacey, Tate, and Trieu began developing the commission plan.  Pl.'s Resp. to Def.'s SUMF ¶ 41.  The process took nearly six months and went through several revisions.  Id. ¶¶ 42, 45.  On July 28, 2021, PeopleScout "rolled out" the PeopleScout Sales Team 2021 Incentive Plan ("2021 Incentive Plan") [Doc. 68-17].  Id. ¶ 46.  The 2021 Incentive Plan provides as follows:

> Deals that qualify for commissions under this plan include Recruitment Process Outsourcing, Recruiter On Demand, Managed Service Provider, and other projects for PeopleScout service offerings in which a sales process including client meetings, proforma, proposal, and contract were created and whereby the sales person contributed materially to the sales process.

2021 Incentive Plan at 1.  The 2021 Incentive Plan provided for commission eligibility "based upon actual revenue."  Id. at 2.  It is undisputed that the 2021 Incentive Plan excluded "Renewals," which the Plan defined as "a client contract that will be expiring, or has expired, that is being proposed as an extension/new contract to a client."  Id. at 7.  It is further undisputed that "Sales Employees are not eligible to earn commissions on [Renewal] transactions."  Id.; Pl.'s Resp. to Def.'s SUMF ¶ 50.

The 2021 Incentive Plan further provides that PeopleScout "has complete discretionary authority to determine who is eligible to potentially earn an

Incentive[5] under the Plan."  2021 Incentive Plan at 5.  PeopleScout also retained

discretion to

> interpret, change, or discontinue this Plan at any time without prior
> notice.  In no event will any Employee be deemed to have a vested right
> to payment of an Incentive under this Plan.  By accepting an Incentive,
> the Employee acknowledges receipt of, and understands and agrees to,
> this Plan, and understands that a copy of the Plan is available upon
> request.  The Employee further acknowledges that the Plan set forth is
> the entire understanding between the Employee and the Company
> regarding Incentives hereunder and supersedes all prior oral and written
> agreements on that subject.
>
> ***
>
> This Plan supersedes all previous commission Plans or arrangements
> between Company and Employee.  Since business needs can change
> substantially during the course of the fiscal year, this Plan, and any
> assigned  targets,  territories,  accounts,  commission  rates,  or  bonus
> amounts are subject to change at any time at Company's sole discretion
> without prior notice.

Id. at 6.

It is undisputed that Kitchens received his first commission check on August

27, 2021, and had never received a commission check before the 2021 Incentive

Plan was implemented.  Pl.'s Resp. to Def.'s SUMF ¶¶ 57-58.

---

[5] "Incentive" is defined as "any bonus, commission, or other supplemental
payment, that is paid in addition to the Employee's usual base compensation as
described in this Plan."  2021 Incentive Plan at 5.

On February 21, 2022, PeopleScout implemented the PeopleScout RPO Sales Team 2022 Incentive Plan ("2022 Incentive Plan") [Doc. 68-22]. Pl.'s Resp. to Def.'s SUMF ¶ 70. "[T]he main material changes within the 2022 Plan were that commissions would be calculated according to segment profit," as opposed to actual revenue, "and the clarification that expansion deals with existing clients did not qualify for commissions." Id. ¶ 72. Subsequently, on February 25, 2022, Kitchens received a payment of $164.24 in commissions. Kitchens's Payslips [Doc. 68-18] at 56.

### 3.    PeopleScout's Contract with Waste Management

Since 2020, Gibson-Smith's job has been devoted to partnering with Waste Management, Inc. ("WM"), which has been a client of PeopleScout for over 20 years, "[d]ue to the size of the Waste Management contract[.]" Dep. Tr. of Denise Gibson-Smith (Dec. 15, 2023) ("Gibson-Smith Dep.") [Doc. 69-4]. Until 2021, PeopleScout "provided partial cycle recruiting services for all of [WM's] staffing needs in the northern United States and Canada," and a competitor, Cielo, handled the southern region of the United States. Pl.'s Resp. to Def.'s SUMF ¶¶ 23-24.

The existing contract between PeopleScout and WM for the partial cycle work was set to expire at the end of 2021. Id. ¶ 25. As part of the contract renewal process, sometime in March 2021, WM's head of acquisitions contacted

Gibson-Smith about "expanding PeopleScout's scope of work" to "expand its partial cycle work to the southern United States."  Id. ¶¶ 23, 25; see also Email from Jerry Tang Re: Approval Request: Waste Management RPO Expansion (Mar. 22, 2021) ("Mar. 22 Email") [Doc. 68-21] at 1.  WM also notified Gibson-Smith that it would be inviting PeopleScout and other talent acquisition companies to respond to a Request for Proposal ("RFP") for full cycle services for drivers and technicians in June.  Pl.'s Resp. to Def.'s SUMF ¶ 27; Def.'s Resp. to Pl.'s SUMF ¶ 18.  Gibson-Smith and Jerry Tang ("Tang"), a Solution Architect for the Business Development Team who reported to Tate, began working on the RFP response in March 2021.  Pl.'s Resp. to Def.'s SUMF ¶ 27; Mar. 22 Email at 1 (noting that the "[s]takeholder [WM] is asking us to present a Full Cycle RPO model for both regions").[6]

### 4.    Kitchens's Involvement in the WM Deal

On June 16, 2021, PeopleScout received the RFP for full-cycle services.  Email from Gibson-Smith to Lamon, Gould, Tang, and Lisa Shrewsbury re: Waste

---

[6] Kitchens disputes that work on the RFP response began in March, pointing to emails sent in June 2021 showing that "[t]he RFP response was still being worked on until at least June 25, 2021."  Pl.'s Resp. to Def.'s SUMF ¶ 27; Microsoft Teams Meeting Invitation from Tang to Kitchens (June 17, 2021) [Doc. 82-17]; June 25, 2021, Email from Elaine Nicol to various PeopleScout Employees [Doc. 82-19].

RFP for Drivers & Techs (June 16, 2021) [Doc. 68-14 at 2].  Gould emailed Mark

Jauregui ("Jauregui") and Tate, stating that Tang would be "lead[ing] the charge"

on the WM deal, "but it be may [sic] nice to have someone from the sales team

review our pitch.  We have just kicked Cielo out and I don't want to let someone

else in."  Emails Between Gould, Tate, and Jauregui (June 16-17, 2021) [Doc.

68-14 at 1].  Tate responded, "I would have Jeff Kitchens from sales side."  Id.  It

is undisputed that Tate told Gould that Kitchens "was not going to do this for free"

and "has got to get paid commission."  Def.'s Resp. to Pl.'s SUMF ¶ 27

(alterations accepted).

Sometime in May or June 2021, Tate approached Kitchens and asked "if

he'd be willing to try to procure all of [WM's RPO] work."  Pl.'s Resp. to Def.'s

SUMF ¶ 34; Aff. of George Tate (Sept. 13, 2022) ("Tate Aff.") [Doc. 82-23] ¶ 7.

However, the WM Deal was classified as either a "Renewal" or "Expansion,"[7] thus

precluding any opportunity for Kitchens to receive commissions for his work on it.

---

[7] The WM Deal was a Renewal insofar as the contract with WM was set to expire
at the end of the year, and PeopleScout was proposing an extension or a new
contract.  Tate Aff. ¶ 10.  However, several employees of PeopleScout testified that
the WM Deal also qualified as an Expansion, which Gould defined as "taking
[PeopleScout's] current footprint and expanding it to other areas."  Dep. Tr. of
Christopher James Gould, Jr. (June 6, 2023) [Doc. 80-1] at 24; Gibson-Smith Dep.
at 10 (testifying that 2021 was "the first year . . . of the expansion contract").  The
2021 Incentive Plan is silent as to whether Expansions are eligible for
commissions, but the 2022 Incentive Plan does define Expansions and provides

Pl.'s Resp. to Def.'s SUMF ¶ 34.  Kitchens was concerned that the WM Deal

"would be time-consuming" and that he would have to pass up his current and

potential commission-eligible opportunities.  Def.'s Resp. to Pl.'s SUMF ¶ 29.

Kitchens voiced these concerns to Tate and said that he "did not want to work the

Deal unless he got paid a commission on it."  Id. ¶ 30.

Tate then spoke with Lacey and Gould "and told them that if [Kitchens]

agreed to work the WM Deal and was able to close it, then we should pay him a

commission."  Tate Aff. ¶ 11.  According to Tate, Lacey and Gould agreed, and

Tate relayed the agreement to Kitchens—"that he would be paid 'full

commissions' on the WM Deal if he worked and closed the Deal by the end of

2021," and that the commissions would be calculated "according to the ARR

Commission Table on Page 2 of the [2021 Incentive] Plan."[8]  Tate Aff. ¶¶ 11-12;

---

that employees are "not eligible to earn commissions on these transactions."
Compare 2021 Incentive Plan at 7, with 2022 Incentive Plan at 5.

[8] The ARR Commission Table in question is reproduced below:

ARR Commission Table:

| Revenue Tiers | Commission % |
|---|---|
| $0-$5,000,000 | 3.00% |
| $5,000,001-$7,000,000 | 3.50% |
| $7,000,001-$9,000,000 | 4.00% |
| >$9,000,001 | 5.50% |

Tate testified that the final version of the ARR Commission Table was not in effect
in June 2021, when Tate purportedly made the agreement with Kitchens.  Dep. Tr.

Def.'s Resp. to Pl.'s SUMF ¶ 32.  However, Tate and Kitchens "did not discuss the work Tate expected Kitchens to do on the Deal to get it closed," and Kitchens never followed up with Tate about the commissions on the WM Deal after making the initial agreement.  Def.'s Resp. to Pl.'s SUMF ¶ 33; Pl.'s Resp. to Def.'s SUMF ¶¶ 40, 60.

Beginning on June 17, 2021, Kitchens became involved in the meetings and emails regarding the WM Deal.  Def.'s Resp. to Pl.'s SUMF ¶ 53.  The parties dispute the extent of work that Kitchens did on the WM Deal.  Gibson-Smith maintained that Kitchens did not contribute meaningfully to moving the WM Deal forward.  Dep. Tr. of Denise Gibson-Smith as the 30(b)(6) Representative of PeopleScout (Mar. 21, 2024) ("Gibson-Smith 30(b)(6) Dep.") [Doc. 69-5] at 29-30; Def.'s Resp. to Pl.'s SUMF ¶¶ 71-74.  However, Kitchens and Tate maintained during their depositions that Kitchens was instrumental in securing the WM Deal.  Tate Dep. at 73 (testifying that Kitchens "did a lot on this deal and without him, we wouldn't have secured the business"); Pl.'s SUMF ¶¶ 66-79

---

of George Tate (Jan. 10, 2024) ("Tate Dep.") [Doc. 69-2] at 95, 98.  Tate also testified that he did not recall sharing previous versions of the ARR Commission Table with Kitchens, Tate Dep. at 95-96, and Kitchens does not dispute that "[r]ank-and-file employees, including [Kitchens], were not privy to the different iterations of the plan."  Pl.'s Resp. to Def.'s SUMF ¶ 45.  However, Kitchens testified that he had access to the ARR Commission Table at the time the oral agreement was made.  Kitchens Dep. at 233, 261.

(outlining the efforts made by Kitchens to stay updated on the progress on the deal, his attendance at presentations and meetings, and the notes he made to update SalesForce and upper management).

On October 6, 2021, Gibson-Smith emailed Kitchens and nine other PeopleScout employees informing them that PeopleScout had been verbally awarded the WM Deal. Def.'s Resp. to Pl.'s SUMF ¶ 79; Email from Gibson-Smith (Oct. 6, 2021) [Doc. 77-11 at 49]. And on October 7, 2021, Lamon sent Kitchens an email outlining the terms to be included in the finalized contract and stated, "Not sure if you need this as you're drafting the contract." Def.'s Resp. to Pl.'s SUMF ¶¶ 80-82; see also Email from Lamon to Kitchens (Oct. 7, 2021) [Doc. 77-11 at 50-51].[9] Also on October 7, 2021, Gould emailed several PeopleScout employees and thanked them for their work on the WM Deal, stating, "Jeff/Jerry/Elaine – the intense modeling and multiple sales presentations were key to get buy-off from WM." Email from Gould (Oct. 7, 2021) [Doc. 77-19 at 2-3].

Throughout October and November, additional PeopleScout employees from the Legal Team, including Meaghan Pomeroy, and the Implementation Team,

---

[9] PeopleScout maintains that the "contract" that was executed with WM was actually an addendum to the Master Services Agreement that WM and PeopleScout initially executed in 2017. See Am. No. 3 to Master Services Agreement [Doc. 78-11]; Gibson-Smith 30(b)(6) Dep. at 40-41.

including Jennifer Parker, did additional work to ensure that the WM Deal officially closed.  Def.'s Resp. to Pl.'s SUMF ¶¶ 84, 86-88.  Kitchens was involved in the emails, meetings, and presentations throughout this time, but the parties, again, dispute the extent of Kitchens's involvement.  See, e.g., Pl.'s SUMF ¶¶ 89-102 (detailing Kitchens's involvement, including sending emails, reviewing documents, and attending meetings); Def.'s Resp. to Pl.'s SUMF ¶¶ 105 (describing Kitchens's involvement as "menial secretarial work").

The contract for the WM Deal was "fully executed" on December 13, 2021.  Def.'s Resp. to Pl.'s SUMF ¶ 103.  PeopleScout began providing the full-cycle services pursuant to the WM Deal in January 2022 and sent its invoice for the first month's services on January 31, 2022.  Pl.'s Resp. to Def.'s SUMF ¶ 33.  PeopleScout received payment for the first invoice on March 23, 2022.  Decl. of Kim Trieu (May 14, 2024) [Doc. 68-3] ¶ 14.

### 5.    PeopleScout's Denial of Kitchens's Requests for Commission Payments

Lacey and Tate left PeopleScout in October and November 2021, respectively.  Pl.'s Resp. to Def.'s SUMF ¶ 61.  Tate's position was replaced by Jessie McGowan ("McGowan") in December 2021.  Id. ¶ 62.  On February 3, 2022, Kitchens had a "one-on-one meeting" with McGowan and asked "about the payment of his commissions on the WM Deal."  Def.'s Resp. to Pl.'s SUMF ¶ 109.

Because McGowan was new to the position and had no knowledge of the WM Deal, McGowan reviewed the 2021 Incentive Plan and spoke with Gibson-Smith about Kitchens's request for commissions.  Pl.'s Resp. to Def.'s SUMF ¶¶ 78-79; Dep. Tr. of Jessie McGowan (Mar. 30, 2024) ("McGowan Dep.") [Doc. 69-6] at 72, 82.  Gibson-Smith told McGowan that "[Tate] wanted [Kitchens] in on [the WM Deal], so I let him be a fly on the wall" and "let him schedule a couple of calls," but that Kitchens "didn't do shit."  McGowan Dep. at 83-84.  McGowan also met with Rick Betori, the President of PeopleScout since early 2022, who indicated that he did not know "why [Kitchens] would have worked on a renewal, but if his complaint is a commission, that's why he gets a . . . generous base of [] $150K."  Id. at 17, 41, 85; Pl.'s Resp. to Def.'s SUMF ¶¶ 81-83.

McGowan informed Kitchens that he would not be receiving commissions from the WM Deal on February 3, 2022.  Pl.'s Resp. to Def.'s SUMF ¶ 84.  Kitchens's employment was subsequently terminated on February 25, 2022.  Def.'s Resp. to Pl.'s SUMF ¶ 119.

### B.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A party seeking summary judgment has the burden of informing

the district court of the basis for its motion and identifying those portions of the

record which it believes demonstrate the absence of a genuine issue of material

fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions," and cannot be made by the district

court in considering whether to grant summary judgment. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins.

Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must

present evidence demonstrating a genuine issue of material fact or that the movant

is not entitled to judgment as a matter of law. Celotex, 477 U.S. at 324. In

determining whether a genuine issue of material fact exists, the evidence is viewed

in the light most favorable to the party opposing summary judgment, "and all

justifiable inferences are to be drawn" in favor of that opposing party. Anderson,

477 U.S. at 255; see also Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th

Cir. 1999). A fact is "material" only if it can affect the outcome of the lawsuit

under the governing legal principles. Anderson, 477 U.S. at 248. A factual dispute

is "genuine" if the evidence would permit a reasonable jury to return a verdict for

the nonmoving party. Id. "If the record presents factual issues, the court must not

decide them; it must deny the motion and proceed to trial." <u>Herzog</u>, 193 F.3d at

1246.  But "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party," summary judgment for the moving party is

proper.  <u>Matsushita</u>, 475 U.S. at 587.

"The standard of review for cross-motions for summary judgment does not

differ from the standard applied when only one party files a motion, but simply

requires a determination of whether [any] of the parties deserves judgment as a

matter of law on the facts that are not disputed." <u>Klim v. DS Servs., Inc.</u>, 225 F.

Supp. 3d 1373, 1376 (N.D. Ga. 2015) (citing <u>Am. Bankers Ins. Grp. v. United</u>

<u>States</u>, 408 F.3d 1328, 1331 (11th Cir. 2005)).  As such, "[t]he Court must consider

each motion on its own merits, resolving all reasonable inferences against the party

whose motion is under consideration." <u>Id.</u>  Further, although "[c]ross-motions for

summary judgment will not, in themselves, warrant the court in granting summary

judgment . . . [they] may be probative of the non-existence of a factual dispute

when . . . they demonstrate a basic agreement concerning what legal theories and

material facts are dispositive." <u>United States v. Oakley</u>, 744 F.2d 1553, 1555-56

(11th Cir. 1984) (quoting <u>Bricklayers Int'l Union, Loc. 15 v. Stuart Plastering Co.</u>,

512 F.2d 1017, 1023 (5th Cir. 1975)).

### C.    Preliminary Matters

#### 1.    The Parties' Replies to Responses to Their Respective Statements of Material Facts

Both Kitchens and PeopleScout filed replies to the opposing party's responses to their respective statements of material facts.  See Pl.'s Reply to Def.'s Resp. to Pl.'s SUMF [Doc. 96-1]; Def.'s Reply to Pl.'s Resp. to Def.'s SMF [Doc. 91-2].  However, the Local Rules of this Court "do[] not contemplate the filing of such replies."  Ebert v. Bd. of Regents of the Univ. Sys. of Ga., No. 1:08-CV-1974-WSD-SSC, 2009 WL 10671050, at *2 (N.D. Ga. Aug. 11, 2009) (citing LR 56.1(B), NDGa.)  Instead, the Local Rules provide

> that a movant for summary judgment shall file a statement of undisputed material facts; the respondent shall file a response to the movant's statement of facts, as well as a statement of additional facts the respondent contends are material and in dispute; and the movant shall file a response to the respondent's statement of additional facts.

Id. (citing LR 56.1(B), NDGa.).  "As several judges in this District have noted, the Local Rules do not provide for reply filings in further support of a party's own statement of material facts."  GSR Markets Ltd. v. McDonald, 593 F. Supp. 3d 1208, 1215-16 (N.D. Ga. 2022), aff'd, No. 23-11222, 2024 WL 3311315 (11th Cir. July 5, 2024) (citing Shenzhen Shenchuang Elec. Appliance Co. v. HauteHouse, LLC, No. 1:20-CV-05337-SCJ, 2021 WL 5033823, at *1 (N.D. Ga. Sept. 1, 2021); and Moore-Tolden v. AirTran Airways, Inc., No. 1:07-CV-1654-WSD-SSC, 2009

WL 10666355, at *2 (N.D. Ga. July 2, 2009), <u>R&R adopted</u>, No. 1:07-CV-1654-

WSD-SSC, 2009 WL 10669476 (N.D. Ga. Aug. 28, 2009)); <u>see also</u> <u>Circle Grp.,</u>

<u>L.L.C. v. Se. Carpenters Reg'l Council</u>, 836 F. Supp. 2d 1327, 1350 (N.D. Ga.

2011) ("Local Rule 56.1 B. only authorizes a reply where a non-movant files a

separate statement of additional facts with its response to the movant's statement

of undisputed facts").   These courts have ignored the parties' replies in support of

their own statements of material facts.  This Court follows suit and declines to

consider the parties' reply filings.

> ### 2.  Kitchens's Objections to the Declaration of Yelena Malinouskaya and Exhibits to Peoplescout's Motion

> #### a.  The Declaration and Exhibits

In support of its Motion for Summary Judgment, PeopleScout submits the

Declaration of Yelena Malinouskaya ("Malinouskaya Decl.") [Doc. 68-8], who has

been employed by PeopleScout as the Human Resources ("HR") Business Partner

since October 2021.  Malinouskaya Decl. ¶ 3.  Malinouskaya avers "under penalty

of perjury" that, in her position, she is "responsible for all human resources

functions for the Company" and is "required to track and maintain all personnel

documents within an employee's personal file." <u>Id.</u> ¶¶ 1, 4, 14.  Malinouskaya also

avers that she "act[s] as the custodian of the Company's human resources and

personnel records maintained as part of a regular practice and kept in the course of

regularly [sic] business." Id. ¶ 4.  Malinouskaya then describes several exhibits to
PeopleScout's Motion for Summary Judgment "based on [her] personal knowledge
of PeopleScout's policies and procedures and a review of the Company records
kept and maintained in the ordinary course of the Company's business."  Id.
¶¶ 5-13.

Malinouskaya avers that Exhibit 4 "is a true and correct copy of
PeopleScout's Job Description for the position of Director of Business
Development during 2021 and 2022."  Malinouskaya Decl. ¶ 7; Job Description for
Director of Business Development ("Job Description") [Doc. 68-6].  Malinouskaya
also asserts that all such job descriptions "are kept and maintained by
PeopleScout's HR department in the ordinary course of business."  Malinouskaya
Decl. ¶ 7.

Next, Malinouskaya avers that Exhibit 5 "is a true and correct copy of the
Employment Agreement signed and returned by Plaintiff on January 21, 2021."  Id.
¶ 8; Employment Agreement.  Malinouskaya also avers that PeopleScout maintains
the Employment Agreement on its "Oracle" platform, PeopleScout's personnel
management platform, and that the document is uploaded to the employee's
personnel file "upon completion of the onboarding task of e-signing and agreeing
to the Employment Agreement."  Malinouskaya Decl. ¶¶ 6, 8.

Finally, Malinouskaya declares that page 1 of Exhibit 7 is a "true and correct copy of a screen shot of Plaintiff's onboarding checklist" in Oracle.  Id. ¶ 10; Oracle Screenshots at 1.

> This onboarding screen is maintained by PeopleScout as part of regularly conducted business activity on the Oracle system to track the onboarding process.  New-hire candidates are allowed access to the Oracle site to complete their onboarding tasks.  The Candidate clicks on each onboarding task and is provided the corresponding agreement/paperwork necessary to complete the task.  The candidate must then follow the instruction within the prompt for completing each task.  Once complete, Oracle notes the task as complete.  Oracle designates completed tasks with a green check mark and denotes the date when it was completed.  PeopleScout tracks these onboarding tasks and maintains records of completion in the regular and ordinary course of business.

Malinouskaya Decl. ¶ 10.  Similarly, Malinouskaya avers that page 2 of Exhibit 7 is a "true and correct copy of Plaintiff's e-signature of his Employment Agreement."  Id. ¶ 11; Oracle Screenshots at 2.

> This online e-signature is maintained by PeopleScout on its Oracle platform to track onboarding progress.  As a part of PeopleScout's regular conducted business activity, upon completion of the onboarding task, the field is approved and maintained in Plaintiff's personnel file.  It is PeopleScout's policy that a candidate cannot begin employment until the Employment Agreement is signed.  As Page 2 of Exhibit 7 notes, the "agreement must be signed before [the] first day of work."

Malinousakaya Decl. ¶ 11.

b.    **Kitchens's Objections**

Kitchens filed objections to the Malinouskaya Declaration and the exhibits described above.  See generally Pl.'s Objs.  Kitchens contends that, because Malinouskaya did not begin working for PeopleScout until October 2021, and because the documents she purports to authenticate were created in January 2021, she cannot have "'personal knowledge' of when the documents were created, how they were created, or how they were maintained from January of 2021 through at least October of 2021."  Id. at 3-4.  Kitchens also argues that Exhibits 4, 5, and 7 do not fall within the business records exception from the hearsay rule, FED. R. EVID. 803(6), and thus are not sufficiently authenticated under Rule 902(11) or 902(b)(1) of the Federal Rules of Evidence.

The Federal Rules of Civil Procedure provide that, on summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).  However, "evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, 'as long as the evidence could ultimately be presented in an admissible form.'" Smith v. Marcus & Millichap, Inc., 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) (quoting Lossia v. Flagstar Bancorp, Inc., 895 F.3d 423, 429 (6th Cir. 2018)).

Under the business records exception to the hearsay rule, "[a] record of an act, event, condition, opinion, or diagnosis" is admissible as evidence if:

> **(A)** the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> **(C)** making the record was a regular practice of that activity;
>
> **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> **(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6).

> The plain language of Rule 803(6) permits the introduction of business records that would otherwise be inadmissible as hearsay evidence provided that 'the testimony of the custodian or other qualified witness' verifies the record-keeping procedure of the document in question and confirms that such document is created as part of normal business practice.

United States v. Dickerson, 248 F.3d 1036, 1048 (11th Cir. 2001) (quoting FED. R. EVID. 803(6)). "The touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." United States v. Bueno-Sierra, 99

F.3d 375, 378 (11th Cir. 1996) (citing United States v. Veytia–Bravo, 603 F.2d 1187, 1189 (5th Cir. 1979)[10]).

Kitchens first argues that Malinouskaya cannot have personal knowledge of Kitchens's Job Description, Employment Agreement, or the Oracle Screenshots because those documents were purportedly created in January 2021, and Malinouskaya did not begin working for PeopleScout as the HR Business Partner until October 2021. Pl.'s Objs. at 3-4. The Court finds this argument meritless. Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated." The United States Court of Appeals for the Eleventh Circuit has explained: "It is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." United States v. Atchley, 699 F.2d 1055, 1059 (11th Cir. 1983) (quoting United States v. Jones, 554 F.2d 251, 252 (5th Cir. 1977)).

---

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

More recently, the Eleventh Circuit has rejected the argument that first-hand knowledge is required to lay the proper foundation for business records.  In <u>United States v. Langford</u>, 647 F.3d 1309 (11th Cir. 2011), the defendant argued that bank records were improperly admitted because the proffered custodial witness, an employee of the bank's Financial Advisory Team, did not have personal knowledge of each of the records.  <u>Langford</u>, 647 F.3d at 1326.  The court rejected this argument, pointing to the advisory committee's note to Rule 803(6), as clarified by the 1974 amendment:

> It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the [record] must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the [record] was based.  A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such [records] upon a transmission from a person with knowledge . . . .

<u>Id.</u> at 1326-27 (quoting FED. R. EVID. 803 advisory committee's note).  Thus, the court found that the United States Government had laid a proper foundation for the business records where the bank employee testified that "she was the custodian of the records, that she had personal knowledge of the process involved in gathering the documents, that the documents had been gathered from ongoing businesses at the bank, . . . and that the documents were part of, or appeared to be part of, documents routinely held in the normal course of business."  <u>Id.</u> at 1327.

Here, Malinouskaya avers that, as the HR Business Partner, she is "responsible for all human resource functions" for PeopleScout, is "required to track and maintain all personnel documents within an employee's personal file," and "act[s] as the custodian of [PeopleScout's] human resources and personnel records." Malinouskaya Decl. ¶ 4. Malinouskaya also avers that she bases the facts in her declaration on her personal knowledge of PeopleScout's policies and procedures and on her review of the records kept by PeopleScout in the ordinary course of business. Id. ¶ 5. The Court finds these statements sufficient to satisfy the personal knowledge requirement contained in Federal Rule of Civil Procedure 56(c)(4). See Duke v. Nationstar Mortg., L.L.C., 893 F. Supp. 2d 1238, 1244-45 (N.D. Ala. 2012) (finding that the declaration of the company's vice president met the requirement of personal knowledge where the vice president stated that he based the facts set forth in the declaration on his review of the company's records).

The Court also finds that the challenged exhibits are admissible under the business records hearsay exception because Malinouskaya properly lays a foundation for the documents. Malinouskaya avers that PeopleScout's HR department maintains all job descriptions in the ordinary course of business, and that Exhibit 4 is a "true and correct copy" of the Job Description for the position Kitchens held in 2021 and 2022. Id. ¶ 7. Malinouskaya further avers that Exhibit

5 is a "true and correct copy" of the signed Employment Agreement, which was

uploaded to Kitchens's personnel file on Oracle upon Kitchens's completion of the

task of e-signing the document and has been maintained there in the ordinary

course of business. Id. ¶ 8. Finally, Malinouskaya avers that Oracle is the system

PeopleScout uses to track completion of onboarding tasks, and that the screenshots

submitted as Exhibit 7 are "true and correct cop[ies]" of Kitchens's onboarding

checklist and e-signature of the Employment Agreement. Id. ¶¶ 10-11. Once a

task on the onboarding checklist is completed, "Oracle notes the task as complete"

by "designat[ing] completed tasks with a green check mark and denot[ing] the date

when it was completed." Id. ¶ 10.

The Court finds that these statements are sufficient to lay the foundation for

PeopleScout's business records. See In re Cap. One Bank Credit Card Int. Rate

Litig., 51 F. Supp. 3d 1316, 1324 n.25 (N.D. Ga. 2014), as corrected (Nov. 3,

2014), aff'd sub nom. Barker v. Cap. One Bank (USA), N.A., 622 F. App'x 894

(11th Cir. 2015) (finding that a proffered custodial witness of account records was

not required to have personal knowledge of the account records, and that it was

sufficient that the declaration was based "both on his personal knowledge and his

review of the relevant records") (internal quotations omitted); Duke, 893 F. Supp.

2d at 1244-45 (finding that the vice president properly laid a foundation for the

company's business records where he stated that the documents were "kept in the course of the company's regularly conducted business activity," and that it was "part of the regular practice to create such documents").

The cases relied on by Kitchens do not persuade this Court otherwise.  In Riley v. University of Alabama Health Services Foundation, P.C., 990 F. Supp. 2d 1177 (N.D. Ala. 2014), the court held that affidavit testimony based merely on belief or speculation is not competent summary judgment evidence and excluded the plaintiff's testimony that the defendant changed a job description "in an obvious effort to disqualify" the plaintiff.  Riley, 990 F. Supp. 2d at 1187.  And in Batres-Garay v. U.S. Att'y Gen., 748 F. App'x 204, 208 (11th Cir. 2018), the Eleventh Circuit found no error in the immigration judge's exclusion of the plaintiff's declaration testimony regarding officers' non-consensual entry into his apartment because the plaintiff was in another room during the entry and did not personally observe it.  Batres-Garay, 748 F. App'x at 208-209.  Neither case considered the admissibility of business records and the declaration testimony of a "custodian or another qualified witness."  FED. R. EVID. 803(6)(D).

Accordingly, Kitchens's objections to the Malinouskaya Declaration and Exhibits 4, 5, and 7 are **OVERRULED**.

**D.     Analysis**[11]

**1.     Breach of Oral Contract**

In its Motion for Summary Judgment, PeopleScout argues that Kitchens's breach of contract claim fails as a matter of law because (1) PeopleScout retained the right to modify the terms of any commission payments, thus making any promise for commissions an unenforceable executory obligation; (2) PeopleScout required any agreement guaranteeing compensation to be in writing, thus making any oral agreement for future compensation unenforceable; (3) Kitchens fails to establish that the parties agreed to all material terms of the purported oral agreement; (4) even if the parties entered a valid oral contract, such contract was superseded by the 2021 and 2022 Incentive Plans; and (5) even if the oral agreement is enforceable, Kitchens did not earn any commission payments before his termination.  Def.'s Br. at 16-34.

In his Motion for Summary Judgment, Kitchens contends that the oral contract between himself and Tate is a valid contract because (1) Tate had the apparent authority to bind PeopleScout to the agreement; (2) there was mutual

---

[11] The parties agree that the substantive law of Georgia applies to Kitchens's state law claims.  <u>Gasperini v. Ctr. for Human., Inc.</u>, 518 U.S. 415, 416 (1996); <u>see also</u> <u>Reisman v. Gen. Motors Corp.</u>, 845 F.2d 289, 291 (11th Cir. 1988) (holding that "[e]xcept in matters governed by the federal Constitution or by acts of Congress, federal courts in diversity cases must apply the law of the forum state").

assent as to the terms; (3) there was valid consideration; and (4) the subject matter of the agreement was sufficiently definite. Pl.'s MPSJ Br. at 20-29. Kitchens also argues that the 2021 Incentive Plan is void because it constitutes an illusory promise. Id. at 29-32. Finally, Kitchens argues that he is entitled to commissions, attorneys' fees and costs, and prejudgment interest. Id. at 32-34.

"The elements of breach of contract in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Bates v. JPMorgan Chase Bank, NA, 768 F.3d 1126, 1130 (11th Cir. 2014) (quoting Norton v. Budget Rent A Car Sys., Inc., 307 Ga. App. 501, 502 (2010)). But before the Court can reach the issue of breach, it first must determine whether a valid contract was formed between the parties. Under Georgia law, "a valid contract includes three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms." Netsoft Assoc., Inc. v. Flairsoft, Ltd., 331 Ga. App. 360, 362-63 (quoting Thompson v. Floyd, 310 Ga. App. 674, 681 (2011)); see also O.C.G.A. § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.").

> A contract is an agreement between two or more parties for the doing or not doing of some specific thing. In order that there may be an

agreement, the parties must have a distinct intention common to both and without doubt or difference.  Until all understand alike, there can be no assent, and, therefore, no contract.  Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms.  If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement.

BDI Laguna Holdings, Inc. v. Marsh, 301 Ga. App. 656, 663-64 (2009).

### a.   The terms in the Employee Handbook do not constitute a valid contract.

PeopleScout argues that Kitchens is precluded from asserting a breach of contract claim based on the oral agreement with Tate because the purported oral agreement "violates PeopleScout's governing policies and procedures for compensation" contained in the Employee Handbook.  Def.'s Br. at 19-20.  In response, Kitchens contends that (1) the provisions within the Employee Handbook are not enforceable because it is not a contract; (2) the policy that Defendants rely on only applies to agreements that modify the "terms and conditions" of employment, and the oral agreement with Tate only modified the payment of commissions; and (3) PeopleScout waived any requirement that modifications be in writing when Tate received approval from Brannon to pay Kitchens commissions on the WM Deal.  Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. 82] at 5-8.

In Georgia, the general rule is that "the policies and information in personnel or employee manuals neither create a contract, nor support a claim for breach of contract." O'Connor v. Fulton Cnty., 302 Ga. 70, 71 (2017) (citations omitted); see also Anderson v. DataPath, Inc., No. 1:20-CV-1713-MHC, 2022 WL 17069583, at *15 (N.D. Ga. Feb. 25, 2022) (citing cases from this district holding that an employee handbook that expressly states that it is not a contract cannot form the basis of a breach of contract claim). Georgia courts have created an exception to this general rule and held that "provisions in an employee manual relating to additional compensation plans, of which an employee is aware, may amount to a binding contract between the parties." Ellison v. DeKalb Cnty., 236 Ga. App. 185, 186 (1999). Courts have applied this exception and found enforceable contracts in cases where an employee handbook promised the employee his regular rate of pay in the event of an on-the-job injury, Fulton-DeKalb Hop. Auth. v. Metzger, 203 Ga. App. 595, 595, 597 (1992), provided that an employee terminated by the employer would not be entitled to any vacation pay, Shannon v. Huntley's Jiffey Stores, Inc., 174 Ga. App. 125, 126 (1985), or provided that an employee would be entitled to severance pay under certain conditions upon termination, Fletcher v. Amax, Inc., 160 Ga. App. 692, 695 (1981).

In contrast, provisions in personnel manuals relating to termination procedures, reclassification of an employee's position, or rest-break procedures have been held to not create contractual rights or obligations. See Jones v. Chatham Cnty., 223 Ga. App. 455, 459 (1996); Adams v. City of Macon, No. 5:03-CV-158 (CAR), 2007 WL 9751876, at *9 (M.D. Ga. Jan. 29, 2007); Harvey v. Walmart Stores, Inc., No. 1:21-cv-03265-VMC-RDC, 2023 WL 3029661, at *12 (N.D. Ga. Jan. 5, 2023), R&R adopted sub nom. Harvey v. Walmart, Inc., No. 1:21-CV-03265-VMC, 2023 WL 3029655 (N.D. Ga. Mar. 27, 2023), aff'd, No. 23-11213, 2024 WL 1460314 (11th Cir. Apr. 4, 2024)).  Indeed, the Georgia Supreme Court has held that a regulation contained in an employee manual that referenced the salary of a temporary appointment was not a "guarantee [of] future compensation," where the plaintiff asserted that the regulation "gave him a contractual right to return to his former position at the conclusion of his temporary appointment; any concern regarding future compensation is dependent upon and collateral to his central argument of being returned to his former position." O'Connor, 302 Ga. at 72-73 (footnote omitted).

The provision of the Employee Handbook that PeopleScout attempts to enforce as a contractual obligation states as follows:

Other than the Chief Executive Officer of the Company or his/her designated agents, no one has the authority to make any agreement for

> employment other than for employment at will or to make any
> agreement limiting the Company's discretion to modify the terms and
> conditions of employment. Only the Chief Executive Officer has the
> authority to make any such agreement and then only in writing. No
> implied contract concerning any employment-related decision or term
> or condition of employment can be established by any statement,
> conduct, policy, or practice.

Employee Handbook at 9. However, this provision is not a guarantee of future

compensation, and the Employee Handbook explicitly states that it is "a summary

of current policies of PeopleScout, Inc.[,]" and that "[n]either this handbook nor

any of its contents is an employment contract or an offer to enter into an

employment contract, and neither provides employees with any contract rights."

Id. at 2. Accordingly, the cited provision creates no contractual rights or

obligations. Although Kitchens and Tate may have violated company policy,

Kitchens was not contractually limited by the Handbook's "requirement" that "any

agreement limiting the Company's discretion to modify the terms and conditions of

employment" be made by the Chief Executive Officer in writing. Employee

Handbook at 9; see also White v. Georgia Dep't of Tech. & Adult Educ., No. 1:08-

CV-3503-GET, 2010 WL 11507593, at *8 (N.D. Ga. July 29, 2010) (citing Ellison,

236 Ga. App. at 186) ("Georgia law provides that procedural policies in employee

manuals are not to be regarded as a binding contract, but merely as information

concerning employment.").

Neither party cites to any binding authority which holds that a provision in an employee handbook restricting the employee's right to enter into oral agreements with the employer is enforceable. Moreover, neither party cites any case wherein an employer attempted to use the terms of an Employee Handbook as a defense (as opposed to an employee asserting a breach of contract claim based on promises contained in an employee handbook).[12]  The Court finds that the terms in the Employee Handbook relied upon by PeopleScout to preclude Kitchens's breach of contract claim are analogous to those that have been found by Georgia courts not to create contractual rights. Specifically, the provision that only the CEO of PeopleScout, in writing, can make "any agreement for employment" and "any agreement limiting the Company's discretion to modify the terms and conditions" of employment, Employee Handbook at 9, is not a "guarantee [of] future compensation." O'Connor, 302 Ga. at 72. Thus, PeopleScout cannot assert that

---

[12] PeopleScout relies on Turner Broadcasting System v. McDavid, 303 Ga. App. 593, 599 (2010), to argue that "a handbook **can** dictate that an agreement for guaranteed compensation be in writing." Def.'s Br. at 20.  However, in McDavid, the issue was whether an oral agreement was binding despite the existence of a letter of intent—not a provision contained in an employee handbook—which outlined "proposed sale terms and establish[ed] a 45-day exclusive negotiating period," and neither party argued the contractual validity of the letter of intent or its provision that any agreement had to be in writing.  McDavid, Ga. App. at 594, 599.  Other than McDavid, PeopleScout directs the Court to no binding legal authority holding that a violation of policies contained in an Employee Handbook can form a valid defense against a breach of contract claim.

the Employee Handbook placed contractual obligations on Kitchens relating to

compensation.  In other words, the cited provision does not "relat[e] to additional

compensation plans" so as to fall within a recognized exception to the general rule

that provisions in employee handbooks do not create contractual rights.  Ellison,

236 Ga. App. at 186.

> ### b. Any oral agreement for future payment of commissions was an unenforceable executory obligation.

PeopleScout argues that the oral agreement between Tate and Kitchens is

unenforceable because PeopleScout retained the right to modify Kitchens's

compensation or commissions at any time.  Def.'s Br. at 17-19.  PeopleScout

argues that the Offer Letter, Employment Agreement, Employee Handbook, and

the 2021 and 2022 Incentive Plans all put Kitchens on notice from the outset of his

employment that PeopleScout retained the discretion to modify or cancel

commission payments at any time.  Id. at 17-18.  Furthermore, PeopleScout

contends that, because it retained the right to modify the terms of any commission

agreement, the oral agreement between Kitchens and Tate was an unenforceable

executory obligation.  Id. at 18.  According to PeopleScout, because McGowan

informed Kitchens that PeopleScout would not be paying him commissions on the

WM Deal before such commissions were earned and payable, PeopleScout was

well within its right to cancel the commissions.  Id. at 18-19 (citing Rapier v. IBM, No. 1:17-CV-4740-MHC, 2018 U.S. Dist. LEXIS 117504, at *11 (N.D. Ga. Apr. 12, 2018)).

In response, Kitchens argues that, under Georgia law, an employer's right to modify the terms of employment "applies only to prospective changes in the [terms of employment] of which the employee was given notice."  Pl.'s Opp'n at 4 (quoting Cox v. Erwin, 246 Ga. App. 439, 440 (2000)).  Kitchens cites several cases to support his argument that PeopleScout was foreclosed from modifying the oral agreement with Tate once Kitchens began performing pursuant to that contract.  Id. at 4-5 & n.4 (collecting cases).  According to Kitchens, he completed performance under the contract when the WM Deal closed in December 2021, whereas PeopleScout reneged on its promise to pay him commissions in February 2021, and "[b]y then, it was too late for [PeopleScout] to cancel commissions."  Id. at 5.

> Under Georgia law, an employee cannot sue to enforce future performance of an at-will employment contract and cannot seek damages for breach of that contract.  However, an at-will employee may sue for any compensation that is due him under an oral contract, based on services actually performed by him up to the time of discharge.  In short, Georgia law provides that an at-will employee . . . can recover damages which have accrued under the contract.

<u>Livernois v. Med. Disposables, Inc.</u>, 837 F.2d 1018, 1023 (11th Cir. 1988) (citing

<u>E.D. Lacey Mills, Inc. v. Keith</u>, 183 Ga. App. 357, 369-60 (1987)).  The Georgia

Supreme Court has held that, to be enforceable, "the promise of future

compensation must be made at the beginning of the employment" and "must

<u>also</u> be for an exact amount or based upon a 'formula or method for determining

the exact amount of the bonus.'"  <u>Arby's, Inc. v. Cooper</u>, 265 Ga. 240, 241 (1995)

(quoting <u>Christensen v. Roberds of Atlanta, Inc.</u>, 189 Ga. App. 289, 291-92

(1988)).  Otherwise, where "the basis for rendering certain the bonuses promised to

[an employee] is at least in part afforded by a future exercise of

discretion[,] . . . the promise to pay a bonus in the future amounts to a promise to

change the terms of compensation in the future and, thus, is an unenforceable

executory obligation."  <u>Id.</u> at 242 (citing <u>Keith</u>, 183 Ga. App. at 360).

Here, it is undisputed that PeopleScout retained the right to modify the terms

of compensation at any time.  <u>See</u> Offer Letter at 2 ("Subject to the terms of your

Employment Agreement with the Company should you accept this offer, the

Company reserves the right to modify your compensation . . . as circumstances

dictate.").[13]  It is also undisputed that the agreement between Tate and Kitchens

---

[13] Although Kitchens, in his response to PeopleScout's Statement of Undisputed
Material Facts, disputes that the Offer Letter is a contract, <u>see</u> Pl.'s Resp. to Def.'s
SUMF ¶ 9, Kitchens raises no such argument in his brief.  "The Court will not

was not made at the beginning of the employment, but instead was made in June

2021, five months after Kitchens began working for PeopleScout.  Def.'s Resp. to

Pl.'s SUMF ¶¶ 25-28, 47, 49.  Because it is undisputed that Kitchens was hired as

an at-will employee, and the promise for future compensation was not made at the

beginning of his employment, the Court finds that any promise made between Tate

and Kitchens in June 2021 for commissions on the WM Deal was an unenforceable

executory obligation.  See Arby's, Inc., 265 Ga. at 241; see also Shelnutt v. Mayor,

333 Ga. App. 446, 451 (2015) (quoting Biven Software, Inc. v. Newman, 222 Ga.

App. 112, 115 (1996)) ("[A]lthough in an at-will relationship, a promise of a future

change in compensation generally 'is unenforceable since neither party is bound to

continue performance under the contract at all,' this rule does not apply to a

promise of future compensation made at the beginning of the employment

---

consider any fact . . . stated as an issue or legal conclusion."  LR 56.1B(1), NDGa.
Even if the Court were to entertain Kitchens's argument, which was not properly
raised in his opposition brief, the Court finds that the Offer Letter does constitute a
contract.  Kitchens is correct that the Offer Letter states that it is not "intended to
be a contract of employment or a promise of specific treatment in specific
situations unless expressly set forth herein."  Offer Letter at 2 (emphasis added).
But it is nonetheless an offer of employment contingent upon additional events,
which was accepted by Kitchens (as evidenced by his e-signature), and there was
consideration—employment as the Director of Business Development in exchange
for compensation of $160,000 annually.  "A definite offer and complete
acceptance, for consideration, create a binding contract." Moreno v. Strickland,
255 Ga. App. 850, 852 (2002).

relationship. Such a promise 'is enforceable, though it would not be if made pending the term or after performance was complete.'") (footnote omitted).

Moreover, although Kitchens and Tate testified that the commission from the WM Deal was to be calculated based on the ARR Commission Table on page 2 of the 2021 Incentive Plan, the agreement regarding Kitchens's compensation remained subject to PeopleScout's discretion. See Phillips v. Adams, Jordan & Herrington, P.C., 350 Ga. App. 184, 187-88 (2019) (finding an agreement for compensation unenforceable where the agreement had a partial formula for calculating compensation, but the plaintiff admitted that the employer "retained some discretion in how compensation would be calculated"); Arby's, Inc., 265 Ga. at 241 (finding promise of future compensation unenforceable where the amount of the bonus was based partially on a formula and partially on the company president's discretion). "Put another way: because [PeopleScout] possesses the discretion to modify commission payments, its 'promise to pay a bonus in the future amounts to a promise to change the terms of compensation in the future and, thus, is an unenforceable executory obligation.'" Wilson v. Int'l Bus. Machines Corp., No. 1:12-CV-1406, 2014 WL 11462883, at *3 (N.D. Ga. Sept. 30, 2014), aff'd, 610 F. App'x 886 (11th Cir. 2015) (quoting Arby's, Inc., 265 Ga. at 242).

Kitchens contends that, because he began performing under the oral agreement, PeopleScout was precluded from unilaterally altering the promise. Pl.'s Opp'n at 4-5. The Georgia Court of Appeal's decision in Keith, 183 Ga. App. 357, is particularly informative on this point. In Keith, the defendants, Keith and Shakley, filed counterclaims against their former employer for unpaid bonuses, commissions, and salary increases. When the defendants were hired under an oral agreement that was terminable at will, the employer agreed to the following terms: (1) Shakley was to be paid a commission of 2% of the employer's annual sales as his compensation for employment; (2) Keith was to receive a beginning annual salary of $50,000, to increase to $70,000 after a specified time; (3) both defendants were to receive stocks and the option to purchase additional stocks; (4) both defendants were to receive an annual performance bonus; and (5) Keith was to be paid the bonus he would have received from his previous employer.

The court found that summary judgment was not appropriate on Shakley's counterclaim for unpaid commissions because the two percent commission was "the amount of compensation due him, based upon services actually performed by him up to the time of his discharge, and not for damages or for compensation of services not performed or for any breach of contract." Keith, 183 Ga. App. at 359 (quoting Brazzeal v. Commercial Cas. Ins. Co., 51 Ga. App. 471, 471 (1935)).

Although Kitchens relies on this portion of the <u>Keith</u> court's ruling, the Court finds that it does not apply here.  In <u>Keith</u>, the employment agreement itself, which was made at the time the defendants were hired, provided that Shakley would receive the 2% commissions as compensation; it was not an additional agreement made during the course of Shakley's employment that would have increased Shakley's compensation.  But here, it is undisputed that Kitchens's compensation was set at $160,000 annually, and that the oral agreement with Tate concerning commissions on the WM Deal was an agreement for additional compensation.  Pl.'s Resp. to Def.'s SUMF ¶ 5; Def.'s Resp. to Pl.'s SUMF ¶ 26 (undisputed that Tate told Gould that Kitchens would not work the WM Deal for free and "has got to get paid commission," and that Gould agreed).  Thus, <u>Keith</u>'s holding regarding Shakley's commissions is inapplicable to this case.

The court in <u>Keith</u> found that summary judgment was appropriate on the defendants' counterclaim for year-end annual performance bonuses based on the statute of frauds.  <u>Keith</u>, 183 Ga. App. at 361.  However, the court did note that this promise of bonuses "was distinguishable from an unenforceable promise to change the terms of compensation in the future," because the promise was "made a part of the initial compensation offer to induce defendants to accept employment."  <u>Id.</u>

The court noted that such a promise would not be enforceable "if made pending the term [of employment] or after performance was complete." Id.

Finally, the court found that summary judgment was appropriate on Keith's counterclaim to recover the promised salary increase. Id. Like Kitchens here, Keith argued that "the promise to increase salary is no longer executory since he performed under the contract," and that "an employee may maintain an action to recover damages for breach of an oral contract of employment when the employee has performed the requested services." Id. The court rejected Keith's argument:

> [I]in the case sub judice, there was no change in the terms or conditions of the contract, but merely an unenforceable promise of future performance. In a terminable-at-will employment contract the original terms for compensation are enforceable for that work actually performed under the contract. However, a promise of future change in compensation is unenforceable since neither party is bound to continue performance under the contract at all.

Id. (emphasis added). Like the promise of increased salary that the court found unenforceable in Keith, the Court finds that the promise to award Kitchens commissions on the WM Deal is "a promise of future change in compensation" and is, thus, unenforceable. Indeed, the promise that PeopleScout would pay commissions on the WM Deal was "made pending the term" of employment, not at the beginning, and falls squarely within the type of promise held unenforceable in Keith. Id. ("[S]uch a promise, made at the beginning of the employment, is

enforceable, though it would not be if made pending the term or after performance was complete.").

The cases Kitchens relies on to support his argument are inapposite. Kitchens cites <u>Cox</u>, 246 Ga. App. at 440, for the proposition that an employer "is not at liberty to change the agreed rate of pay *after* the associated work has been performed." Pl.'s Opp'n at 4 (quoting <u>Cox</u>, 246 Ga. App. at 440). The plaintiff in Cox was an at-will independent contractor—not an employee—of the defendant; there was no employment contract governing the parties' relationship; and the entire agreement between the parties was that the defendant would pay the plaintiff "60 percent of the profit from the sales he made." <u>Cox</u>, 246 Ga. App. at 440. Here, however, the agreement for compensation made at the beginning of Kitchens's employment was a salary of $160,000.00 per year and eligibility "to participate in the individual sales commission plan." Offer Letter at 1. And in <u>Brunson v. C.B.A., Inc.</u>, 189 Ga. App. 621 (1988), the plaintiff accepted employment with the defendant based on oral promises that commissions would be paid. <u>Brunson</u>, 189 Ga. App. at 621. In response to the plaintiff's inquiries throughout his employment, the employer continually represented to the plaintiff that a commission plan was forthcoming, and that the plaintiff would be receiving commissions checks in a lump sum. <u>Id.</u> However, the employer ultimately refused

to pay commissions at the end of the fiscal year and denied that any such promise for commissions was made.  Id. at 622.  Unlike the plaintiff in Brunson, Kitchens was not promised commissions on the WM Deal, which was an existing client of PeopleScout, at the beginning of his employment.  Moreover, as explained above, Kitchens was on notice that PeopleScout could modify Kitchens's compensation at any time.  The court in Brunson makes no mention of any such reservation of rights by the employer.

Because the Court finds that any oral agreement between Tate and Kitchens was an unenforceable executory obligation, the Court need not address the parties' arguments regarding whether the agreement was sufficiently definite, or whether the 2021 Incentive Plan was a contract that superseded the oral agreement.  PeopleScout's Motion for Summary Judgment is **GRANTED** as to Kitchens's breach of contract claim, and Kitchens's Motion for Partial Summary Judgment is **DENIED** as to his breach of contract claim.

### 2. Promissory Estoppel

PeopleScout seeks summary judgment on Kitchens's claim for promissory estoppel, arguing that (1) the oral agreement was too vague to form the basis of a promissory estoppel claim, and (2) Kitchens's reliance on any oral agreement was unreasonable as a matter of law.  To succeed on a claim under the equitable

48

doctrine of promissory estoppel, a plaintiff must demonstrate that "the defendant made a promise upon which he reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right." Thompson, 310 Ga. App. at 682 (citing Pabian Outdoor–Aiken, Inc. v. Dockery, 253 Ga. App. 729, 730-731 (2002)). "Detrimental reliance which causes a substantial change in position will constitute sufficient consideration to support promissory estoppel." Clark v. Byrd, 254 Ga. App. 826, 828 (2002).

Pretermitting any analysis of whether the promise was too vague to be enforceable, the Court finds that the PeopleScout's retention of the right to modify the payment of commissions precludes a finding that Kitchens reasonably relied on any promise of commission for the WM Deal. Although "[t]he question of whether a party reasonably relied on the promise of another is ordinarily a factual inquiry for a jury to resolve[,] . . . a determination of reasonableness can be made as a matter of law if a prior disclaimer or disclosure prevents justifiable reliance on the representation." Gilmour v. Am Nat'l Red Cross, 385 F.3d 1318, 1321 (11th Cir. 2004) (citations omitted). As discussed above, Kitchens's Offer Letter put Kitchens on notice that PeopleScout "reserve[d] the right to modify your compensation, duties, reporting relationship, title, or continued employment as

circumstances dictate." Offer Letter at 2. Accordingly, viewing the evidence in a light most favorable to Kitchens, his reliance on Tate's promise was not reasonable under the circumstances as a matter of law. See Snyder v. Int'l Bus. Machs. Corp., No. 1:16-cv-03596-WMR, 2019 WL 8277241, at *4 (N.D. Ga. Mar. 18, 2019) (holding that the "plain terms" of the plaintiff's Incentive Plan Letters—"which made it clear that [the defendant] retained sole discretion to change the terms of the plan and to adjust [the] Plaintiff's commissions—preclude [the] Plaintiff from arguing that he justifiably relied on any alleged promises outside the [Incentive Plan Letters]"); Gilmour, 385 F.3d at 1321-22 (holding that the plaintiff's reliance on oral statements regarding additional medical coverage was unreasonable in light of written statements contained in the defendant's manual, which set forth procedures for compensating volunteers injured while volunteering and contained no promises regarding medical coverage).

Accordingly, PeopleScout's Motion for Summary Judgment is **GRANTED** as to Kitchens's promissory estoppel claim.

### 3.   Unjust Enrichment/Quantum Meruit

PeopleScout seeks summary judgment on Kitchens's unjust enrichment claim, arguing that Kitchens cannot show that "he was not reasonably compensated or performed any duty outside of his normal responsibilities." Def.'s Br. at 36-37

(citing <u>Shepherd v. Pilgrim's Pride Corp</u>, No. 1:04-CV-3530-JOF, 2007 WL

781883, at *5-6 (N.D. Ga. Mar. 12, 2007)).  In response, Kitchens argues that,

because the value to PeopleScout of the work that Kitchens did "was much higher

than what Kitchens received for his services," summary judgment is not

appropriate on his unjust enrichment claim.  Pl.'s Opp'n at 33.

      "The equitable doctrine of quantum meruit prevents a person who benefits

from another's services to be unjustly enriched by those services." <u>Jackson v.</u>

<u>Ford</u>, 252 Ga. App. 304, 308 (2001) (citing <u>Nelson & Hill, P.A. v. Wood</u>, 245 Ga.

App. 60, 62 (2000)).  Similarly, the theory of unjust enrichment is "premised upon

the principle that a party cannot induce, accept, or encourage another to furnish or

render something of value to such party and avoid payment for the value received."

<u>Id.</u> (quoting <u>Scott v. Mamari Corp.</u>, 242 Ga. App. 455, 458 (2000)) (internal

quotations omitted).  A plaintiff may recover the "reasonable value" of the services

performed under quantum meruit or unjust enrichment, but the value is "defined in

terms of value to the recipient." <u>Id.</u>  To prevail on a claim for quantum meruit, the

plaintiff must demonstrate the following essential elements: "(1) the performance

of valuable services; (2) accepted by the recipient or at his request; (3) the failure

to compensate the provider would be unjust; and (4) the provider expected

compensation at the time services were rendered." <u>Amend v. 485 Properties</u>, 280

Ga. 327, 329 (2006) (citing <u>Hollifield v. Monte Vista Biblical Gardens</u>, 251 Ga.

App. 124, 128 (2001)).

The Court finds that Kitchens's quantum meruit claim fails as a matter of

law.  Under Georgia law, a plaintiff may not recover under quantum meruit or

unjust enrichment if the plaintiff fails to demonstrate that he or she "was not

already reasonably compensated for her [or his] services."  <u>Rodriguez v. Vision</u>

<u>Correction Grp., Inc.</u>, 260 Ga. App. 478, 479 (2003).  Kitchens concedes that he

was paid his regular salary during the time he worked on the WM Deal, which

amounted to approximately $76,000, Kitchens's Paystubs at 17-46, but argues that

the WM Deal resulted in revenues of over $31 million from January 2022 through

February 2024, and that a reasonable jury could find that the payment of only

$76,000, or 0.25%, of the revenues, was not reasonable compensation for

Kitchens's services.  <u>Id.</u> at 33-34.  However, Kitchens cites no legal authority to

support this argument.  Instead, Kitchens simply attempts to distinguish the cases

relied on by PeopleScout, but to no avail.

First, in <u>Walker v. Gen. Motors Corp.</u>, 152 Ga. App. 526 (1979), the

plaintiff sued his employer, alleging that he was "entitled to more money than he

was paid over a period of about five years . . . based on the nature of the work

which he performed and on certain oral promises allegedly made to him by his

supervisors." <u>Walker</u>, 152 Ga. App. at 526-27. The court found that summary judgment was appropriate on the plaintiff's quantum meruit claims because "the plaintiff has submitted nothing to substantiate his novel contention that the salary which he received for his work was so unreasonably low that he is entitled to a recovery based on quantum meruit or unjust enrichment." <u>Id.</u> at 527. Kitchens appears to argue that, unlike in <u>Walker</u>, and when compared to the revenue generated by the WM Deal, his salary of $160,000 per year was unreasonably low. Pl.'s Opp'n at 34. However, nowhere in the <u>Walker</u> decision did the court undertake a comparative analysis of the profits made by the employer and the wages drawn by the employee. Otherwise, Kitchens makes no argument and offers no evidence that his salary of $160,000 was not reasonable compensation for the services he provided.

Second, in <u>Rodriguez</u>, the plaintiff was hired by the defendant for a negotiated starting salary and "was also promised bonuses once [the defendant] became profitable, and eventual stock options." <u>Rodriguez</u>, 260 Ga. App. at 478-79. Throughout her four-year employment, the plaintiff received bonuses on top of her salary but, upon her termination, she sued the employer for "her 'market value' in cash," arguing that she never received the stock options promised. <u>Id.</u> at 479. The Georgia Court of Appeals affirmed the trial court's rejection of this

argument, finding that the plaintiff "cited no cases where an employee was allowed to recover damages in quantum meruit or unjust enrichment after she was already paid the salary she negotiated." Id. Kitchens attempts to distinguish the case on the grounds that the plaintiff admitted that her "total cash compensation" was reasonable, whereas Kitchens disputes the reasonableness of his compensation here. Pl.'s Opp'n at 34-35. However, such an admission is irrelevant because the court in Rodriguez also found that the plaintiff "cannot show that she was not already reasonably compensated for her services." Rodriguez, 260 Ga. App. at 479. Here, too, Kitchens has failed to offer any evidence that Kitchens's salary was not reasonable compensation for his services, and Kitchens has failed to offer any legal authority to support his "novel contention." Walker, 152 Ga. App. at 527. Accordingly, viewing the evidence in a light most favorable to Kitchens, the Court finds that there is no record evidence to support the contention that the salary compensation Kitchens received was not reasonable. Kitchens's quantum meruit/unjust enrichment claim fails as a matter of law, and PeopleScout's Motion for Summary Judgment is **GRANTED** as to this claim.

### 4.    Breach of Fiduciary Duty

PeopleScout also contends that Kitchens's claim for breach of fiduciary duty or confidential relationship fails as a matter of law because (1) the claim is

"premised entirely upon the breach of [an] oral agreement," and thus the claim is

barred by the economic loss rule; and (2) Kitchens fails to establish a confidential

relationship.  Def.'s Br. at 37-39.  In response, Kitchens contends that (1) a jury

could find that Kitchens suffered non-economic harm "such as emotional distress,

mental anguish, inconvenience, loss of enjoyment, etc.," so his claim is not barred

by the economic loss rule; and (2) a jury could find that a confidential relationship

existed based on Kitchens's trust in Tate and Tate's promise to Kitchens.  Pl.'s

Opp'n at 35-37 & n.38.

    In Georgia, "[i]t is well settled that mere failure to perform a contract does

not constitute a tort."  ServiceMaster Co., L.P. v. Martin, 252 Ga. App. 751, 754

(2001).  An exception exists for a claim for breach of fiduciary duty, based on a

confidential relationship between the parties.  Monroe v. Bd. of Regents of Univ.

Sys. of Ga., 268 Ga. App. 659, 661 (2004).  A confidential relationship arises

"where one party is so situated as to exercise a controlling influence over the will,

conduct, and interest of another or where, from a similar relationship of mutual

confidence, the law requires the utmost good faith . . . ."  O.C.G.A. § 23-2-58.

"The party asserting the existence of a fiduciary or confidential relationship bears

the burden of establishing its existence."  O'Neal v. Home Town Bank of Villa

Rica, 237 Ga. App. 325, 330 (1999).  "When a fiduciary or confidential

relationship is not created by law or contract, [the court] must examine the facts of a particular case to determine if such a relationship exists." Yarbrough v. Kirkland, 249 Ga. App. 523, 527 (2001).

> A confidential relationship may exist between business people, depending on the facts. However, the mere circumstance that two people have come to repose a certain amount of trust and confidence in each other as the result of business dealings is not, in and of itself, sufficient to find the existence of a confidential relationship.

Parello v. Maio, 268 Ga. 852, 853 (1998) (citations omitted); see also Howard v. Barron, 272 Ga. App. 360, 364 (2005) (quoting Lewis v. Alderman, 117 Ga. App. 855, 855 (1968)) ("In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone."). Specifically in the employment context, "[t]he employer-employee relationship does not generally give rise to a 'confidential relationship' but it may under certain circumstances." Harris v. Fulton-DeKalb Hosp. Auth., 255 F. Supp. 2d 1347, 1375 (N.D. Ga. 2002) (citing Cochran v. Murrah, 235 Ga. 304, 307 (1975)).

The Court finds that Kitchens has failed to offer any evidence of a confidential relationship. Although the Court is mindful that "the issue of whether a confidential relationship has been created is ordinarily reserved for the jury," Yarbrough, 249 Ga. App. 523, 527 (2001), the Georgia Court of Appeals has

affirmed the grant of summary judgment on claims based on confidential

relationship where "no evidence [was] presented that the relationship was anything

other than one of arms-length bargaining." Irons v. CSX Transp., Inc., 224 Ga.

App. 586, 588 (1997). In Irons, the plaintiff was injured while working within the

scope of his employment with the defendant. While he was hospitalized, a claims

representative for the defendant visited him and told him "not to worry, that he

would take care of everything." Id. at 587. But the representative's

communications with the plaintiff were simply to make settlement offers for the

plaintiff's injuries on behalf of the employer. Id. at 588. The court affirmed the

grant of summary judgment to the employer, finding that the facts "do not show

that [the representative] exercised a controlling influence over [the plaintiff], and

they do not show that the two men interacted from positions of mutual confidence

so that [the plaintiff] should have believed anything other than that their

relationship was an arms-length—and even adversarial—one." Id. The court

distinguished prior cases where the court had found a confidential relationship

because the plaintiff in Irons did not have a longtime personal friendship or

relationship with the representative and offered no evidence that the plaintiff was

"without his faculties or dependent on any other individual to make decisions for

him." Id. (citing Cochran, 235 Ga. at 305 (farm laborer who was employed for

eight years, lived rent-free on the employer's property in a house provided by the employer, and accepted whatever sporadic wages were paid him by the employer); and <u>Capriulo v. Bankers Life Co.</u>, 178 Ga. App. 635, 637, 640 (1986) (employee with a chronic disease who was induced into working for a new employer by a former co-worker who knew of the disease and the intense treatment required— and even visited the employee at the hospital—and who represented to the employee that the new employer's insurance covered treatment for the disease)); <u>see also</u> <u>Fanelli v. BMC Software, Inc.</u>, No. 1:11-CV-00436-JOF, 2013 WL 12190241, at *8 (N.D. Ga. July 29, 2013) (finding a confidential relationship where the employee, who was accused of sexual assault by another employee that allegedly occurred overseas, "has some particular vulnerability and the employer has a greater ability to inform itself with respect to the situation").

Kitchens has produced no evidence that he had any particular vulnerability or had to rely solely on the representations made by Tate for lack of any education, knowledge, or bargaining power. Instead, "the case at bar is marked throughout by dealings at arm's length between two sophisticated parties . . . ." <u>Lucius v. Micro Gen. Corp</u>, No. 1:03-CV-1270-TWT, 2004 WL 1598813, at *4 (N.D. Ga. Apr. 8, 2004). Kitchens is "an educated and experienced professional," <u>see</u> Kitchens Dep. at 10-11 (testifying that he has been in the sales industry for 25 years), and

"[n]othing about the normal employment relationship between [Kitchens] and [Tate] . . . suggests that the parties had a confidential relationship or that [Tate] had any heightened duty to [Kitchens]." Lucius, 2004 WL 1598813, at *4.  Kitchens's testimony that he trusted Tate and Lacey does not transform their employment relationship to a confidential one.  See Kienel v. Lanier, 190 Ga. App. 201, 203 (1989) ("The mere fact that one reposes trust and confidence in another does not create a confidential relationship.").[14]

Viewing the evidence in a light most favorable to Kitchens, the Court finds that there is no record evidence to support Kitchens's claim for breach of confidential relationship and/or fiduciary duty, which fails as a matter of law. PeopleScout's Motion for Summary Judgment is **GRANTED** as to this claim.

---

[14] Although Kitchens relies on Yarbrough, the Court finds that case to be inapposite.  In Yarbrough, the defendant, who owned a real estate company, solicited the plaintiff to invest in real estate with him.  Yarbrough, 249 Ga. App. at 525.  The defendant made representations that the property was worth over twice its actual value, promised to oversee all matters relating to inspecting, renovating, and operating the property as a boarding house, and reassured the plaintiff that she did not need to consult with an attorney.  Id. at 527.  The plaintiff entered into a contract to purchase the house that same date.  Id. at 525.  The court found that an issue of fact existed as to whether there was a confidential relationship based on the sheer scope of fraudulent representations made by the defendant that induced the plaintiff's confidence in the defendant.  Here, there are no allegations or evidence that Tate or PeopleScout engaged in fraud, nor does the scope of representations made by Tate reach the level of reassurance involved in Yarbrough.

5.    **Theft of Services**

PeopleScout also seeks summary judgment on Kitchens's theft of services claim on the grounds that Georgia's criminal theft statute does not create a civil cause of action, and that Georgia courts do not recognize O.C.G.A. § 51-10-6 as creating a private cause of action for theft.  Def.'s Mot. at 41-42.  PeopleScout argues that, even if it does create a private right of action, Kitchens's claim still fails because "the theft statutes punish actual conversion, 'not breach of contract.'" Id. at 42 (quoting Conservit, Inc. v. Glob. Mill Supply, Inc., No. 1:19-CV-00274-ELR, 2019 WL 13207586, at *10 (N.D. Ga. Nov. 12, 2019)).

The Court finds it unnecessary to address PeopleScout's argument with respect to whether Georgia law recognizes a civil cause of action for theft because, assuming that it does, Kitchens's civil theft claim fails as a matter of law.  Georgia courts that have considered similar theft statutes (see, e.g., O.C.G.A. §§ 16-8-2 (theft by taking), 16-8-3 (theft by deception), and 16-8-4 (theft by conversion)), have consistently held that a plaintiff cannot assert a claim in tort arising out of a breach of a contract.  Morris v. Nat'l W. Lift Ins. Co., 208 Ga. App. 443, 444 (1993) (holding that "conversion . . . does not lie on account of a mere failure to pay money due under a contract"); Barrett v. State, 207 Ga. App. 370, 370, 427 S.E.2d 845, 846 (1993) ("The purpose of this statute is to punish fraudulent

conversion, not breach of contract . . . .").[15]  Indeed, Kitchens bases his civil theft

claim on the same grounds as his breach of contract claim: that (1) he worked the

WM Deal after being told he would be paid commissions on it, and (2) he did not

receive commissions on it.  And although Kitchens makes the conclusory argument

that PeopleScout "has taken or appropriated [his] property, with the intention of

depriving Plaintiff of that property, by not remitting the agreed-upon commissions

to Plaintiff," Pl.'s  Opp'n at 42, Kitchens directs the Court to nothing in the record

to support his assertion that there was any intentional deprivation or withholding of

Kitchens's property, and Kitchens cites no case law wherein a Georgia court has

found an actionable civil theft claim premised on non-payment of commissions.[16]

Moreover, the Court has found that viewing the evidence in a light most favorable

to Kitchens, there is no any evidence to suggest that the salary he negotiated and

received was not reasonable as a matter of law.

_____

[15] Although these cases consider theft by conversion, the Court finds the analysis applicable in the theft-of-services context.  Theft by conversion punishes a person who "lawfully obtain[s] funds or other property of another . . . under an agreement or other known legal obligation" but "knowingly converts the funds or property to his own use."  O.C.G.A. § 16-8-4.  Theft of services punishes a person who knowingly obtains services through deception and with the intent to avoid payment.  Id. § 16-8-5.
[16] Moreover, as explained at length in Section II.D.1.b, supra, any promise to pay Kitchens commissions on the WM Deal was an unenforceable executory agreement and, thus, Kitchens was never entitled to the funds that he asserts PeopleScout withheld.

Finally, "mere failure to perform a contract does not constitute a tort" unless "the defendant also breaches an independent duty imposed by law." Martin, 252 Ga. App. at 754. The Court already has found that PeopleScout owed no independent duty to Kitchens outside of any employment contract, and any tort claim sought to be asserted by Kitchens fails as a matter of law.

Accordingly, the Court finds that Kitchens's civil theft claim under O.C.G.A. § 51-10-6 fails as a matter of law, and PeopleScout's Motion for Summary Judgment is **GRANTED** as to this claim.

### 6.      Punitive Damages, Attorney's Fees, and Costs

Finally, PeopleScout argues that Kitchens is not entitled to punitive damages or attorney's fees and costs pursuant to O.C.G.A. § 13-6-11 because (1) there are no underlying tort claims with merit, and (2) there is no evidence that PeopleScout acted in bad faith or was stubbornly litigious. Def.'s Br. at 39-44. "An award of attorney fees, costs, and punitive damages is derivative of a plaintiff's substantive claims." Hobbs ex rel. Eagle v. Integrated Fire Protection, Inc., 357 Ga. App. 790, 802 (2020) (quoting Racette v. Bank of Am., 318 Ga. App. 171, 181 (2012)). Thus, a plaintiff may "prevail on these claims only if he succeeded on an underlying substantive claim." Id. (quoting Home Depot U.S.A. v. Wabash Nat'l Corp., 314 Ga. App. 360, 374 (2012)). Because the Court grants summary

judgment on all of Kitchens's substantive claims, PeopleScout's Motion for Summary Judgment is **GRANTED** as to Kitchens's claims for punitive damages, attorney's fees, and costs, and Kitchens's Motion for Partial Summary Judgment is **DENIED** as to his claim for attorney's fees and costs.[17]

## III.    KITCHENS'S MOTION TO DISMISS

### A.    Relevant Factual Background[18]

PeopleScout alleges that it "invests significant time, money, and energy into researching customer needs, developing marketing strategies, creating financial forecasts and business forecasts, and developing its pricing structure and estimating tools."  Countercl. ¶ 16.  PeopleScout alleges that it keeps its competitive edge in the RPO market by procuring and protecting its confidential information.  Id. ¶ 16-17.  PeopleScout alleges that such information is "not generally known outside of PeopleScout, and PeopleScout only shares it with employees who need to know the information to perform their jobs."  Id. ¶ 17.

---

[17] Furthermore, because no substantive claims remain, Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to his request for an award of prejudgment interest.

[18] Because this case is before the Court, in part, on Kitchens's Motion to Dismiss Counterclaims, the facts are presented as alleged in PeopleScout's Counterclaim [Doc. 81 at 19-34].  See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

PeopleScout requires that its employees "sign and agree to various policies and procedures designed to protect the confidentiality of its information." Id. ¶ 18. PeopleScout alleges that "Kitchens was treated no differently . . . and was required to agree to protect PeopleScout's trade secrets in order to be gainfully employed." Id. ¶ 20. On January 12, 2021, Kitchens signed an Offer Letter, which explained that his employment was "contingent upon his execution" of the Employment Agreement [Doc. 81-1 at 1-7] and an Agreement Regarding Non-Competition, Non-Interference, Non-Solicitation, and Confidentiality ("Confidentiality Agreement") [Doc. 81-1 at 8-16]. Countercl. ¶ 21. PeopleScout alleges that, on January 21, 2021, Kitchens digitally signed the Employment Agreement and the Confidentiality Agreement after accessing PeopleScout's online onboarding system. Id. ¶ 22.

In pertinent part, the Confidentiality Agreement provides:

> Employee agrees that all records and Confidential Information obtained by Employee as a result of Employee's employment with Company . . . are confidential and the sole and exclusive property of Company. Employee understands and agrees that the business of Company and the nature of Employee's employment will require Employee to have access to Confidential Information of and about Company, its business, its Candidates, and its Clients. During Employee's employment and thereafter, Employee will not use Confidential Information or remove any such records from the offices of Company except for the sole purpose of conducting business on behalf of Company. . . . Notwithstanding the foregoing provisions of this paragraph, Employee understands that Employee shall not be held

criminally or civilly liable under any Federal or State trade secret law if Employee discloses a Company trade secret (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. However, in making any disclosure permitted by the foregoing sentence, Employee acknowledges and agrees that Employee must limit such disclosure to only such trade secret(s) that is/are relevant to the report of a suspected violation of law or to the filing made under seal, and may not use or disclose any trade secret(s) for any other purpose, absent the express authorization of Company in a writing signed by a duly authorized officer.

\*\*\*

Employee agrees that upon the cessation of Employee's employment with Company or at the request of Company at any time, Employee will immediately deliver to Company all Company property, including without limitation all information, records, materials, and copies thereof in any form whatsoever, that are related in any way to Company or its business . . . .

Confidentiality Agreement §§ B, D. PeopleScout alleges that, after Kitchens signed the Agreements, Kitchens "was given access to PeopleScout's trade secrets, and he used these trade secrets to perform work for and on behalf of PeopleScout." Countercl. ¶ 24.

After Kitchens's employment with PeopleScout was terminated, Kitchens began working for Randall Reilly in April 2023 as the Vice President of Sales. Id. ¶ 29. And on July 15, 2022, Randall Reilly "announced it was launching a new RPO division," becoming a direct competitor of PeopleScout. Id. ¶ 28.

65

PeopleScout alleges that, since working for Randall Reilly, Kitchens "has successfully closed more than three times the number of deals he closed for PeopleScout," and that his "success with Randal [sic] Reilly raises significant concerns that Kitchens was using PeopleScout's trade secrets to do so." Id. ¶ 29.

PeopleScout discovered Kitchens's alleged misappropriation of its trade secrets during the course of this litigation. Id. ¶ 30. Specifically, PeopleScout alleges that Kitchens produced documents "that contained a trove of trade secrets" on November 14, 2023, and confirmed during his deposition on December 11, 2023, that he had taken the trade secret documents and was working for a competitor. Id. ¶¶ 30, 34. PeopleScout alleges that Kitchens's proffered reason for taking the trade secret documents—to pursue his claims against PeopleScout—are untrue based on (1) several allegedly "untrue" statements made by Kitchens, (2) the alleged fact that Kitchens did not limit his "misappropriation" of trade secrets to those relating to the WM Deal. Id. ¶¶ 36-38. PeopleScout lists one example:

> Kitchens misappropriated a project list generated by PeopleScout's SalesForce program that includes business opportunities nationwide and identifies the customer, the type and scope of the work, and in some instances, the expected revenue. Neither Waste Management generally nor the WM Deal is even listed in this project list.

Id. ¶ 38.

**B.     Legal Standards**

"A motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) is evaluated in the same manner as a motion to dismiss a complaint." United States v. Zak, 550 F. Supp. 3d 1349, 1351 (N.D. Ga. 2021) (quoting Great Am. Assurance Co. v. Sanchuk, LLC, No. 8:10-CV-2568-T-33AEP, 2012 WL 195526, at *2 (M.D. Fla. Jan. 23, 2012)).  Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the counterclaim as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader.  Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations.  Iqbal, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

## C.    Analysis

Kitchens contends that PeopleScout's counterclaims should be dismissed because (1) PeopleScout failed to comply with this Court's May 24, 2024, Order; (2) Kitchens is immune from liability under the DTSA and the GTSA; and (3) PeopleScout fails to adequately allege that Kitchens acquired trade secrets by improper means.  Pl.'s Mot. to Dismiss at 2-10.  Kitchens also asks this Court to strike PeopleScout's Affirmative Defense 31 under Federal Rule of Civil Procedure 12(f).  Id. at 10-12.  Because the Court finds that PeopleScout fails to

adequately allege claims under the GTSA or DTSA based on acquisition by improper means, the Court finds it unnecessary to consider Kitchens's arguments seeking dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.

With respect to the merits of PeopleScout's Counterclaim, Kitchens argues that (1) PeopleScout fails to adequately allege that Kitchens's "acquisition," "removal," or "retention" of the trade secret documents was improper; (2) even if Kitchens's retention of the documents were improper, improper retention "does not support a claim for 'acquisition by improper means,' under the DTSA or GTSA"; and (3) PeopleScout has not plausibly alleged that Kitchens retained the trade secrets "by any means other than through disclosure to his lawyer," which does not violate the Confidentiality Agreement.  Pl.'s Mot. to Dismiss at 6-10.  In response, PeopleScout contends that Kitchens's arguments are foreclosed by this Court's prior Order finding that PeopleScout's counterclaims were not futile.[19]  Def.'s Opp'n to Pl.'s Mot. to Dismiss at 9-10.

---

[19] The Court notes that Kitchens's futility argument with respect to PeopleScout's trade secret misappropriation claims based on acquisition by improper means was limited to one paragraph and contained no citation to authority.  See Pl.'s Resp. in Opp'n to Def.'s Mot. for Leave to File Am. & Suppl. Answer & Countercl. at 21. However, in his Motion to Dismiss, Kitchens raises the specific argument that PeopleScout fails to allege that Kitchens's acquisition of the trade secrets during his employment or his retention of the trade secrets after termination support a claim for trade secret misappropriation as a matter of law and cites Angel Oak Mortgage Solutions LLC v. Mastronardi, 593 F. Supp. 3d 1234, 1244 (N.D. Ga.

"A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act requires a plaintiff to prove that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." Cap. Asset Rsch. Corp. v. Finnegan, 160 F.3d 683, 685 (11th Cir. 1998) (internal quotation and citation omitted). The same showings are required under the DTSA but with the additional requirement that the trade secret be "related to a product or service used in, or intended for use in, interstate or foreign commerce." Agilysys, Inc. v. Hall, 258 F. Supp. 3d 1331, 1348 (N.D. Ga. 2017) (quoting 18 U.S.C. § 1836(b)(1)).

The relevant portions of the GTSA and DTSA define "misappropriation" identically as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" O.C.G.A. § 10-1-761(2)(A); 18 U.S.C. § 1839(5)(A). Both statutes also define "improper means" similarly. Under the GTSA, "improper means" includes "theft,

---

2022), for support. Pl.'s Mot. to Dismiss at 8-10. The Court finds that reexamining PeopleScout's Counterclaims in light of Kitchens's arguments raised in his Motion to Dismiss are appropriate and not moot, contrary to PeopleScout's assertions. PeopleScout argues that Kitchens's arguments are moot, but PeopleScout points to no authority holding that a court's futility ruling on a motion to amend operates to preclude consideration of subsequent Rule 12(b)(6) motion. Instead, PeopleScout only points to persuasive authority where a court considering a motion to amend alongside a motion to dismiss found the motion to dismiss to be moot once it granted the motion to amend. See Sanders v. Elimgington Prop. Mgmt., LLC, No. 1:22-CV-03985-SDG, 2023 WL 5352899, at *3 (N.D. Ga. Aug. 21, 2023).

bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means."  O.C.G.A. § 10-1-761(1); <u>see also</u> 18 U.S.C. § 1839(6)(A) (defining "improper means" to include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means").  Both statutes exclude reverse engineering and independent derivation or development from their definitions of improper means.  O.C.G.A. § 10-1-761(1); 18 U.S.C. § 1839(6)(B).

A claimant may show misappropriation by alleging that the defendant "acquired [the trade secrets] despite knowing or having reason to know it was acquired by improper means."  <u>Ronald McDonald House Charities, Inc. v. Ronald McDonald House Charities of W. Georgia, Inc.</u>, No. 4:22-CV-207 (CDL), 2024 WL 310195, at *3 (M.D. Ga. Jan. 26, 2024); <u>see also</u> <u>Pinnacle Agric. Distribution, Inc. v. Mayo Fertilizer, Inc.</u>, No. 1:17-CV-029 (LAG), 2019 WL 13095501, at *11 (M.D. Ga. Mar. 29, 2019) ("Under the GTSA, a defendant misappropriates a trade secret when it acquires a trade secret from someone who the defendant has reason to know acquired it by improper means.").

In <u>Angel Oak</u>, the plaintiff sued several of its former employees who "sent a variety of Plaintiff's business information to their personal email accounts" before

leaving to work for a competing company.  Angel Oak, 593 F. Supp. at 1237.  As

relevant here, one such employee entered into a written agreement containing two

provisions: (1) prohibiting the employee from "disclos[ing], divulg[ing],

publish[ing] to others or in any way us[ing] or apply[ing] any Trade Secrets and/or

Confidential Information except strictly in accordance with [his] duties as an

employee of the Company"; and (2) requiring the employee to "deliver to the

Company all documents, writings, computer programs, diskettes, reports,

information, date (stored in any medium), or any copies thereof, that constitute or

pertain in any way to any Confidential Information" upon the employee's

termination.  Id. at 1244.

    The court first found that the plaintiff's allegations that the employee used or

disclosed the confidential information at his new job were conclusory and

disregarded them, id., just as this Court found with respect to PeopleScout's

allegations regarding Kitchens's alleged use and disclosure of the trade secrets at

Randall Reilly.  See May 24, 2024, Order at 38.[20]  Next, the court found that the

_____

[20] Indeed, the Court relied on Angel Oak in reaching its conclusion that
PeopleScout's trade secret misappropriation claims based on use and disclosure
were futile.  May 24, 2024, Order at 38.  However, as noted above, Kitchens did
not raise any non-conclusory futility arguments with respect to PeopleScout's
claims based on acquisition by improper means, and the Court did not consider
Angel Oak's discussion regarding this theory of liability, as it does here.

plaintiff's allegations that the employee emailed the confidential documents to himself prior to his termination were insufficient to allege acquisition by improper means:

> Defendant Friedberg simply sent *himself* information to which he already had access as Plaintiff's Inside Account Executive. . . . And moving information from one storage location to another—both controlled by the same person—does not "use or apply" that information within the ordinary meaning of those words. You do not "use or apply" a product when you move it from the attic to the basement.

Id. (footnote omitted). The court also held that any failure of the employee to return the documents after his termination "would amount to improper <u>retention</u>, not improper <u>acquisition</u>." Id. at 1245. Thus, the court found that the employee's conduct of sending himself the confidential documents "was not the 'means' by which he 'acquired' Plaintiff's information. Either way, the provision does not support a claim under DTSA or GTSA." Id.

The Court finds the facts here to be indistinguishable from those presented in <u>Angel Oak</u>. PeopleScout bases its trade secret misappropriation claims on Kitchens's purported violation of two provisions of the Employment Agreement: (1) Kitchens was prohibited from "us[ing] Confidential Information or remov[ing] any such records from the offices of Company except for the sole purpose of conducting business on behalf of Company," and (2) Kitchens was required to

"immediately deliver to Company all Company property, including without limitation all information, records, materials, and copies thereof" upon termination of Kitchens's employment.  Countercl. ¶ 18; Confidentiality Agreement §§ B, D. Here, as in <u>Angel Oak</u>, PeopleScout alleges that Kitchens "misappropriated" the trade secrets by retaining them even after his termination and for the purpose of competing unfairly with PeopleScout.  Countercl. ¶¶ 34, 39.[21]  However, the conduct prohibited by the clear language of the GTSA and DTSA is the "<u>acquisition</u> of a trade secret of another by a person who knows or has reason to know that the trade secret was <u>acquired</u> by improper means."  O.C.G.A. § 10-1-761(2)(A); 18 U.S.C. § 1839(5)(A) (emphasis added).  And PeopleScout's Counterclaims are devoid of any allegation that Kitchens's <u>acquisition</u> of the trade secret documents was improper.

---

[21] PeopleScout contends that it "clearly alleges that [Kitchens] took copies of the trade secrets from PeopleScout's computing systems (i.e., the only way he could have produced them in discovery) and failed to return them in violation of his confidentiality obligations."  Def.'s Opp'n to Pl.'s Mot. to Dismiss at 10-11. However, a review of PeopleScout's Counterclaim reveals that it is devoid of any "clear[]" or specific allegation regarding the manner in which Kitchens "took" any trade secret documents.  What is clear is that Kitchens was provided access to these documents through the course of his employment.  Countercl. ¶ 24 ("Kitchens was given access to PeopleScout's trade secrets, and he used these trade secrets to perform work for and on behalf of PeopleScout.").

PeopleScout relies heavily on the Court's findings in its previous Order, as well as U.S. Sec. Assocs., Inc. v. Lumby, No. 18-5331, 2019 WL 8277263, at *11 (N.D. Ga. Sept. 25, 2019).  However, Lumby is distinguishable from the facts alleged in PeopleScout's Counterclaim.  In Lumby, the defendant worked as the regional manager for the plaintiff for several years, during which time the defendant signed an employment agreement containing several restrictive covenants, including confidentiality, non-compete, non-solicitation, and non-raiding provisions.  Lumby, 2019 WL 8277263, at *1.  The plaintiff alleged that, after the defendant resigned, he breached the employment agreement when he began working for a competitor within a 100-mile radius and solicited or assisted in soliciting at least three of the plaintiff's customers and at least two of the plaintiff's employees.  Id. at *2.  The plaintiff further alleged that, a week after he submitted his two-weeks' notice, the defendant "performed a massive download of client contact information" from the plaintiff's computer system "for the purpose of utilizing it in his new role" with the competitor.  Id.

The court held that the plaintiff adequately pleaded that the defendant acquired the trade secrets by improper means:

> As clearly outlined in both statutes, "[a] non-disclosure agreement can be the basis for imposing a duty not to disclose a trade secret."  The GTSA defines improper means to include "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy

> or limit use." The DTSA also defines improper means to include
> "breach or inducement of a breach of a duty to maintain secrecy."
> Regardless of his prior access to the confidential information, Lumby's
> violation of the confidentiality provision of the Agreement clearly
> makes his acquisition of the customer list improper.

Id. at *11. The confidentiality agreement between the parties restricted the

defendant from "publishing, disclosing, using for his own benefit or the benefit of

others, or divulging or conveying to others, any Confidential Information of [the

plaintiff." Id. at *10. Thus, in Lumby, the employee not only "performed a

massive download" of the confidential information after submitting his two-weeks'

notice, but also used it to solicit or assist in soliciting the plaintiff's clients and

employees in violation of confidentiality, non-compete, non-solicitation, and non-

raiding provisions of his employment agreement. Id. at *11.

But here, because the Court found that any claims regarding Kitchens's use

and disclosure of the trade secrets fail as a matter of law, PeopleScout can only

rely on the alleged fact that Kitchens merely had possession of the trade secrets.[22]

And even if Kitchens's retention of the trade secret documents violated the

Confidentiality Agreement, the Court agrees with Judge Brown's reasoning in

---

[22] Although PeopleScout alleges that "Kitchens's success with Randal [sic] Reilly raises significant concerns that Kitchens was using PeopleScout's trade secrets to do so," Countercl. ¶ 29, the Court held in its May 24, 2024, Order that PeopleScout may not base its GTSA and DTSA claims on any allegations that Kitchens used or disclosed the trade secret documents. See May 24, 2024, Order at 37-40.

Angel Oak that any such conduct that violated the Confidentiality Agreement "was not the 'means' by which [Kitchens] 'acquired' [PeopleScout's] information," and that Kitchens's failure to return the information "amount[s] to improper retention, not improper acquisition." Angel Oak, 593 F. Supp. 3d at 1245.

Furthermore, the plaintiff in Lumby alleged more than mere possession—namely, that the defendant had violated the confidentiality provision by using the confidential information to solicit both the plaintiff's customers and employees. Lumby, 2019 WL 8277263, at *2, *10-11. "At bottom, the mere possession of a trade secret is not enough to state a claim of threatened misappropriation." AWP, Inc. v. Henry, No. 1:20-CV-01625-SDG, 2020 WL 6876299, at *4 (N.D. Ga. Oct. 28, 2020) (citing Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001) (denying preliminary injunction on misappropriation of trade secrets claim and stating plaintiff "must show more than mere possession of a trade secret by [defendant employee], yet this is all that it has shown")).

Accordingly, the Court finds that PeopleScout fails to sufficiently allege that Kitchens acquired the trade secret documents through improper means, and

Kitchens's Motion to Dismiss the Counterclaims for trade secret misappropriation under the GTSA and DTSA is **GRANTED**.[23]

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant PeopleScout, Inc.'s Motion for Summary Judgment [Doc. 68] is **GRANTED**.

It is further **ORDERED** that Plaintiff Jeffrey Kitchens's Motion for Partial Summary Judgment [Doc. 77] is **DENIED**.

It is further **ORDERED** that Plaintiff Jeffrey Kitchens's Motion to Dismiss Counterclaims and to Strike Affirmative Defense 31 [Doc 93] is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **GRANTED** as to PeopleScout, Inc.'s Counterclaims against Plaintiff, which are **DISMISSED**.  The Motion is otherwise **DENIED AS MOOT**.

The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 30th day of December, 2024.

MARK H. COHEN
United States District Judge

---

[23] Because the Court grants summary judgment to PeopleScout on all of Kitchens's claims against it, Kitchens's Motion to Strike Affirmative Defense 31 is moot.